No. 25-1047

UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

JONES EAGLE LLC,
Plaintiff-Appellee,

v.

WES WARD, et al.
Defendants-Appellants.

On Appeal from the United States District Court
for the Eastern District of Arkansas
No. 4:24-CV-990 (Hon. Kristine G. Baker)

## Defendants-Appellants' Brief

TIM GRIFFIN
  Arkansas Attorney General

AUTUMN HAMIT PATTERSON
  Arkansas Solicitor General

ASHER STEINBERG
  Senior Assistant Solicitor General

OFFICE OF THE ARKANSAS
  ATTORNEY GENERAL
323 Center St., Suite 200
Little Rock, AR 72201
(501) 682-1051
Asher.Steinberg@arkansasag.gov

## SUMMARY OF THE CASE AND STATEMENT
## REGARDING ORAL ARGUMENT

Since this Nation's founding, States have regulated foreign ownership of real and personal property. Acting in that tradition, and following the lead of federal regulators, Arkansas recently passed two laws: one restricting ownership of Arkansas farmland by citizens or businesses of countries to which the State Department restricts arms exports, and one restricting ownership of Arkansas digital asset mining businesses by citizens or businesses of those countries. The court below principally found those laws implicitly preempted by silence in two far-afield regulatory regimes: a statute under which a committee of Cabinet-level officials reviews five real-estate purchases near military bases a year, and the State Department's arms export regulation. But by authorizing review of those particularly sensitive purchases, Congress did not imply that all other foreign real-estate ownership was permissible. And by restricting arms exports to countries like North Korea, the State Department did not imply that all other trade with North Korea should be free. The district court's conclusion to the contrary should be reversed.

Defendants request 20 minutes for argument.

# TABLE OF CONTENTS

Summary of the Case and Statement Regarding Oral Argument.................................................................ii

Table of Contents .....................................................................ii

Table of Authorities.................................................................iv

Statement of Jurisdiction........................................................1

Statement of the Issues Presented .........................................2

Statement of the Case ..............................................................3

    A.  The Challenged Statutes .............................................3

    B.  Factual and Procedural Background...........................5

Summary of the Argument ....................................................15

Argument.................................................................................21

  I.   Standard of Review .....................................................21

  II.  JONES EAGLE'S CLAIMS ARE NOT RIPE. ...................21

  III. JONES EAGLE IS UNLIKELY TO SUCCEED ON ITS
       PREEMPTION CLAIMS.................................................28

    A.  Acts 636 and 174 Are Not Conflict-Preempted. ......28

       1.  Congressional inaction can only conflict-preempt
           state regulation when Congress regulates the
           activity it leaves partially unregulated, and
           leaving the activity partially unregulated is a
           significant objective of federal law....................29

       2.  States have traditionally regulated alien
           property ownership. ...........................................33

       3.  Congress's creation of the narrow CFIUS review
           process did not displace that sphere of
           traditional state regulation................................36

       4.  The State Department's creation of the ITAR list
           of arms-exports-restricted countries did not

     displace state regulation of property ownership
     by nationals of countries on the ITAR list. ......................... 40

    B. Acts 636 and 174 Are Not Field-Preempted ............................ 44

IV. THE OTHER PRELIMINARY-INJUNCTION FACTORS ALSO
    WEIGH IN FAVOR OF DEFENDANTS. ................................................ 53

V. AT MINIMUM, THIS COURT SHOULD VACATE THE DISTRICT
    COURT'S OVERBROAD INJUNCTION. ................................................ 57

Conclusion ........................................................................................ 59

Certificate of Compliance .............................................................. 60

Certificate of Service ...................................................................... 61

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page**

*Abbott v. Perez*,
 585 U.S. 579 (2018) ............................................................... 56

*Am. Ins. Ass'n v. Garamendi*,
 539 U.S. 396 (2003) ........................................... 45-47, 51-52

*Anheuser-Busch, Inc. v. F.T.C.*,
 359 F.2d 487 (8th Cir. 1966) ............................................... 24

*Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n*,
 461 U.S. 375 (1983) ......................................................... 29-30

*Blythe v. Hinckley*,
 180 U.S. 333 (1901) ............................................................... 34

*Cal. Div. of Lab. Standards Enf't v. Dillingham Const., N.A., Inc.*,
 519 U.S. 316 (1995) ............................................................. 30

*CBA Pharma, Inc. v. Perry*,
 No. 22-5358, 2023 WL 129240 (6th Cir. Jan. 9, 2023) ........................ 25

*Chamber of Com. of U.S. v. Whiting*,
 563 U.S. 582 (2011) ............................................................... 43

*Crosby v. Nat'l Foreign Trade Council*,
 530 U.S. 363 (2000) ................................... 2, 31-32, 40-42, 45

*Dataphase Sys., Inc. v. C L Sys., Inc.*,
 640 F.2d 109 (8th Cir. 1981) (en banc) ............................... 53

*Doe v. Hodgson*,
 478 F.2d 537 (2d Cir. 1973) ................................................. 49

*Duit Constr. Co. v. Bennett*,
 796 F.3d 938 (8th Cir. 2015) ............................................... 1,

*Exxon Mobil Corp. v. Schneiderman*,
 316 F. Supp. 3d 679 (S.D.N.Y. 2018) ................................... 26

*Fac. Senate of Fla. Int'l Univ. v. Winn*,
 616 F.3d 1206 (11th Cir. 2010) (per curiam). ............... 43-44, 49-50

*First Choice Women's Res. Ctrs., Inc. v. Att'y Gen. of N.J.*,
   No. 24-3124, 2024 WL 5088105 (3d Cir. Dec. 12, 2024)
   (per curiam) ................................................................. 2, 26

*First Choice Women's Res. Ctrs., Inc. v. Platkin*,
   No. 23-23076, 2024 WL 150096 (D.N.J. Jan. 12, 2024) ....................... 23

*First Choice Women's Res. Ctrs., Inc. v. Platkin*,
   No. 23-23076, 2024 WL 4756044 (D.N.J. Nov. 12, 2024) ........... 2, 26-27

*Geier v. Am. Honda Motor Co.*,
   529 U.S. 861 (2000) ....................................................... 32-33

*Gingery v. City of Glendale*,
   831 F.3d 1222 (9th Cir. 2016) ........................................... 13, 51

*Google, Inc. v. Hood*,
   822 F.3d 212 (5th Cir. 2016) ........................... 2, 22, 24-25, 56

*Hauenstein v. Lynham*,
   100 U.S. 483 (1879) ....................................................... 34-35

*Hicks v. Miranda*,
   422 U.S. 322 (1975) ........................................................... 49

*Hines v. Davidowitz*,
   312 U.S. 52 (1941) ............................................................ 31

*Iowa Utils. Bd. v. FCC*,
   109 F.3d 418 (8th Cir. 1996) ................................................ 54

*Maryland v. King*,
   567 U.S. 1301 (2012) (Roberts, C.J., in chambers) ........................ 56-57

*Medicine Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*,
   336 F.3d 801 (8th Cir. 2003) .............................................. 54-55

*Movesian v. Victoria Versicherung AG*,
   670 F.3d 1067 (9th Cir. 2012) (en banc) .................................... 51

*Ng v. Bd. of Regents of Univ. of Minn.*,
   64 F.4th 992 (8th Cir. 2023) ................................................. 53

*Novus Franchising, Inc. v. Dawson*,
   725 F.3d 885 (8th Cir. 2013) .............................................. 53-54

*Oneok, Inc. v. Learjet, Inc.*,
  575 U.S. 373 (2015) ............................................................ 30

*Org. for Black Struggle v. Ashcroft*,
  978 F.3d 603 (8th Cir. 2020) ....................................... 2, 56

*Pharm. Rsrch. & Mfrs. of Am. v. McClain*,
  95 F.4th 1136 (8th Cir. 2024) .................................. 30, 43

*Planned Parenthood of Ark. & E. Okla. v. Jegley*,
  864 F.3d 953 (8th Cir. 2017) ............................................ 21

*Planned Parenthood Minn., N.D., S.D. v. Rounds*,
  530 F.3d 724 (8th Cir. 2008) (en banc) ......................... 21

*Reisman v. Caplin*,
  375 U.S. 440 (1964) ........................................................... 24

*Rogers Grp., Inc. v. City of Fayetteville*,
  629 F.3d 784 (8th Cir. 2010) ...................................... 2, 54

*St. Louis Effort for AIDS v. Huff*,
  782 F.3d 1016  (8th Cir. 2015) ........................................ 21

*Shames v. Nebraska*,
  323 F. Supp. 1321 (D. Neb. 1971) ......................... 2, 48-50

*Shen v. Simpson*,
  687 F. Supp. 3d 1219 (N.D. Fla. 2023) ......................... 39

*Smith & Wesson Brands, Inc. v. Att'y Gen. of N.J.*,
  27 F.4th 886 (3d Cir. 2022) ...................... 10, 16, 23, 27

*Terrace v. Thompson*,
  263 U.S. 197 (1923) ........................................................... 34

*TikTok Inc. v. Garland*,
  145 S. Ct. 57 (2025) .......................................................... 42

*Trojan Techs., Inc. v. Pennsylvania*,
  916 F.2d 903 (3d Cir. 1990) ............................................ 49

*Twitter, Inc. v. Paxton*,
  56 F.4th 1170 (9th Cir. 2022) ......................................... 25

*Va. Uranium, Inc. v. Warren*,
  587 U.S. 761 (2019) ........................................................... 30

*Williamson v. Mazda Motor of Am., Inc.,*
    562 U.S. 323 (2011) ........................................................ 31, 33

*Winter v. Nat. Res. Def. Council,*
    555 U.S. 7 (2008) .................................................................. 3

*Wis. Dep't of Indus. v. Gould, Inc.,*
    475 U.S. 282 (1986) ............................................................ 32

*Wyeth v. Levine,*
    555 U.S. 555 (2000) ........................................................ 39-40

*Zschernig v. Miller,*
    389 U.S. 429 (1968) .............................. 2, 18-19, 45-53

## Rules, Statutes and Constitutional Provisions

Ark. Code Ann. § 1-2-117 .................................................... 58

Ark. Code Ann. § 1-2-205 .................................................... 58

Ark. Code Ann. § 14-1-603(2) ............................................... 4

Ark. Code Ann. § 14-1-603(5) ............................................... 4

Ark. Code Ann. § 14-1-606(2) ............................................... 4

Ark. Code Ann. § 18-11-802(1)(A)(ii) ................................. 5-6

Ark. Code Ann. § 18-11-802(5) ............................................. 3

Ark. Code Ann. § 18-11-803 .................................................. 3

Ark. Code Ann. § 18-11-804(a) .............................................. 3

Ark. Code Ann. § 23-119-101 ............................................ 4, 57

Ark. Code Ann. § 23-119-105 ........................................... 57-58

28 U.S.C. § 1291 ................................................................... 1

28 U.S.C. § 1292(a)(1) .......................................................... 1

28 U.S.C. § 1331 ................................................................... 1

28 U.S.C. § 2778 ................................................................. 41

48 U.S.C. § 1501 ................................................................. 35

48 U.S.C. § 1502 ................................................................. 35

48 U.S.C. § 1503 ................................................................. 35

48 U.S.C. § 1504 ........................................................................ 35

48 U.S.C. § 1505 ........................................................................ 35

48 U.S.C. § 1506 ........................................................................ 35

48 U.S.C. § 1507 ........................................................................ 35

48 U.S.C. § 1508 ........................................................................ 35

50 U.S.C. § 4565 .......................................................................... 2

50 U.S.C. § 4565(a)(4)(B)(ii). .................................................... 36

50 U.S.C. § 4565(a)(4)(C)(i) ...................................................... 38

50 U.S.C. § 4565(a)(4)(C)(ii). ............................................... 36-38

22 C.F.R. § 126.1 ...................................................................... 31

22 C.F.R. § 126.1(d)(1).............................................................. 41

78 Fed. Reg. 16,129 (Mar. 8, 2013) ......................................... 41

Pub. L. No. 100-418, tit. V, § 5021 (1988)............................... 36

**Miscellaneous**

CFIUS, Annual Report to Congress—Report Period: CY 2023 (2024),
https://home.treasury.gov/system/files/206/2023CFIUSAnnualRe-
port.pdf. ...............................................................................36-37

James A. Frechter, *Alien Landownership in the United States:
A Matter of State Control*, 14 Brook. J. Int'l L. 147 (1988).............. 33, 35

David M. Golove, *Treaty-Making and the Nation: The Historical
Foundations of the Nationalist Conception of the Treaty Power*,
98 Mich. L. Rev. 1075 (2008).................................................. 35

Treaty Concerning the Encouragement and Reciprocal Protection of In-
vestment, Alb.-U.S., Jan. 11, 1995, T.I.A.S. No. 98-104......................... 39

Treaty Concerning the Encouragement and Reciprocal Protection
of Investment, Mozam.-U.S., Dec. 1, 1998, T.I.A.S.
No. 13006.................................................................................. 39

## STATEMENT OF JURISDICTION

The district court had original jurisdiction under 28 U.S.C. § 1331. This Court has appellate jurisdiction over Defendants' appeal from its preliminary-injunction order, entered December 9, 2024, under 28 U.S.C. § 1292(a)(1); Defendants timely appealed on January 7, 2025  It also has jurisdiction under 28 U.S.C. § 1291 and the collateral order doctrine over Defendants' appeal from its denial of Defendants' motion to dismiss this suit for lack of standing and ripeness.  *See Duit Constr. Co. v. Bennett*, 796 F.3d 938, 940–41 (8th Cir. 2015).

# STATEMENT OF THE ISSUES PRESENTED

Whether the district court erred in holding that Jones Eagle's suit was ripe.

> Apposite Authority: *Google, Inc. v. Hood*, 822 F.3d 212 (5th Cir. 2016); *First Choice Women's Res. Ctrs., Inc. v. Platkin*, Civ. No. 23-23076, 2024 WL 4756044 (D.N.J. Nov. 12, 2024), *aff'd sub nom. First Choice Women's Res. Ctrs., Inc. v. Att'y Gen. of N.J.*, No. 24-3124, 2024 WL 5088105 (3d Cir. Dec. 12, 2024) (per curiam).

Whether the district court erred in preliminarily enjoining the enforcement of Act 629 on the ground that it is likely conflict- and field-preempted.

> Apposite Authority: *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000); 50 U.S.C. § 4565; *Zschernig v. Miller*, 389 U.S. 429 (1968); *Shames v. Nebraska*, 323 F. Supp. 1321 (D. Neb. 1971), *aff'd*, 408 U.S. 901 (1972).

Whether the district court erred in holding that Jones Eagle suffered irreparable harm and the balance of harms weighed in its favor.

> Apposite Authority: *Rogers Grp., Inc. v. City of Fayetteville*, 629 F.3d 784 (8th Cir. 2010); *Org. for Black Struggle v. Ashcroft*, 978 F.3d 603 (8th Cir. 2020).

**STATEMENT OF THE CASE**

**A.     The Challenged Statutes**

**1.  Act 636 regulates agricultural land in Arkansas.**

On April 11, 2023, the Arkansas General Assembly enacted Act 636.  That Act prohibits certain foreign-party-controlled businesses from owning Arkansas agricultural land.  Ark. Code Ann. § 18-11-803.  The foreign parties covered by the prohibition are citizens and residents of, or companies organized under the laws of, countries subject to arms export controls under the State Department's International Traffic in Arms Regulations, or ITAR (which includes such countries as China, Iran, North Korea and Venezuela).  *Id.* § 18-11-802(5); 22 C.F.R. § 126.1.  However, the statute exempts citizens and residents of countries subject to ITAR restrictions if they are also resident aliens of the United States.  Ark. Code Ann. § 18-11-804(a).

The statute was enacted following the well-reported incident where a Chinese surveillance balloon flew over the central United States before being shot down by the United States Air Force.  The bill's sponsor expressed his view that "everybody was worried about the balloon taking pictures of the land below it," and reasoned that "[i]f we don't want a

balloon flying over our [land], we shouldn't want [foreign adversaries] owning land" either. Add. 3; App. 64; R. Doc. 35, at 3.

**2. Act 174 regulates digital asset mining in Arkansas.**

About a year after Act 636's passage, the Arkansas General Assembly enacted Act 174 on May 3, 2024. The bulk of that Act creates a permitting regime for digital asset mining businesses in Arkansas, *see* Ark. Code Ann. §§ 23-119-101 *et seq.*, while Section 6 of that Act prohibits certain foreign-party-controlled businesses from owning an interest in those businesses. It defines digital asset mining businesses based on the property they use to mine digital assets: namely, they are defined as "a group of computers working at a single site that consumes more than one megawatt . . . on an average annual basis for the purpose of generating digital assets." Ark. Code Ann. § 14-1-603(5). "Digital assets," in turn, are defined as cryptocurrency, virtual currency, stable coins, nonfungible tokens, and the like. *Id.* § 14-1-603(2).

As in Act 636, prohibited foreign parties are defined as citizens and residents of, or businesses organized under the laws of, countries subject to arms-export controls under the federal ITAR regulations. *Id.* § 14-1-606(2). And like Act 636, Section 6 of Act 174 was motivated by concerns

that crypto-mining facilities in the State were "not Arkansas-owned or American-owned," but rather "foreign adversarially owned." Add. 5; App. 66; R. Doc. 35, at 5 (quoting statements by the act's sponsor).

## B.    Factual and Procedural Background

In December 2023, the Arkansas Department of Agriculture, which enforces Act 636, identified Jones Eagle as potentially violating Act 636, and referred the matter to the Attorney General. Add. 7; App. 68; R. Doc. 35, at 7. Jones Eagle is an LLC that provides digital asset mining services and operates a data center from property it leases in Arkansas County, Arkansas. Add. 11; App. 72; R. Doc. 35, at 11.

Following the Department of Agriculture's referral, Attorney General Tim Griffin informally requested documents showing that (1) Jones Eagle was not a prohibited foreign party, or (2) the land it leased in Arkansas County fell outside Act 636's definition of agricultural land. Add. 8; App. 69; R. Doc. 35, at 8. Act 636 defines agricultural land, in part, as land that has been used in the last five years for farming, ranching, or timber production, but exempts parcels of ten acres or less if the annual gross receipts from those activities did not exceed $1,000. Ark. Code Ann. § 18-11-802(1)(A)(ii).

Jones Eagle failed to produce sufficient documents on these points. It did not produce evidence showing that it was not a prohibited foreign party. And although it produced documents showing that the land was less than ten acres, the documents did not show that annual gross receipts from past farming operations on the land were $1,000 or less to fall outside the definition of agricultural land. Add. 8; App. 69; R. Doc. 35, at 8; *see* Ark. Code Ann. § 18-11-802(1)(A)(ii).

On September 10, 2024, the Attorney General turned to more formal methods and issued an investigative subpoena to Jones Eagle. Add. 8; App. 69; R. Doc. 35, at 8. The subpoena's response deadline was September 25, 2024. *Id.* After Jones Eagle failed to respond, Attorney General Griffin filed a subpoena enforcement action in state court on November 8, 2024. Add. 9; App. 70; R. Doc. 35, at 9.

Five days later, Jones Eagle sued the Attorney General, the Secretary of Agriculture, and the State of Arkansas, asserting five claims. App. 9; R. Doc. 1, at 1. It alleged Act 636 and Section 6 of Act 174 (1) violate the Equal Protection Clause, App. 30–32; R. Doc. 1, at 22–24; (2) are unconstitutionally vague and violated procedural due process, App. 32–34; R. Doc. 1, at 24–26; (3) violate the dormant commerce clause, App. 34;

R. Doc. 1, at 26; (4) are conflict-preempted by various federal statutes and regulations, and field-preempted by the federal government's foreign affairs power generally, App. 35–38; R. Doc. 1, at 27–30; and (5) violate the Takings Clause, App. 38–39; R. Doc. 1, at 30–31. Defendants moved to dismiss the suit on grounds of standing, ripeness, and *Younger* abstention. R. Doc. 16.

Jones Eagle moved for a temporary restraining order and a preliminary injunction six days after it filed suit. R. Doc. 7. In support of its motion, it filed only a single four-page declaration by Chen, Jones Eagle's manager. App. 45–48; R. Doc. 7-1. Though Jones Eagle continued to claim that its parcel fell outside Act 636's definition of agricultural land, Add. 17; App. 78; R. Doc. 35, at 17, Chen primarily hypothesized that were Act 636 or Act 174 to be ultimately enforced against Jones Eagle, it could halt Jones Eagle's operations, temporarily prevent it from being able to service its customers, and cause those customers to leave Jones Eagle for good, even if Jones Eagle found other property from which to operate within or without Arkansas. App. 47–48 ¶¶ 29–35; R. Doc. 7-1, at 3–4 ¶¶ 29–35. But Chen also vaguely alleged that Acts 636's and 174's mere existence, whether they were enforced against Jones Eagle or not,

"ma[de] it harder for [him] to attract investors [and] customers," App. 47
¶ 25; R. Doc. 7-1, at 3 ¶ 25, and would cause Jones Eagle "the loss of
goodwill to an incalculable but substantial degree," App. 47 ¶ 26; R. Doc.
7-1, at 3 ¶ 26.

The district court granted Jones Eagle a temporary restraining or-
der on November 25, 2024, against both the official-capacity defendants
and the State of Arkansas itself, notwithstanding Arkansas's sovereign
immunity. App. 50; R. Doc. 20, at 1. After holding that Jones Eagle had
standing to challenge Acts 636 and 174, App. 51–52; R. Doc. 20, at 2–3,
the district court held that "mere investigations and investigative pro-
ceedings, including subpoenas" that had not yet been enforced by a court,
"do not qualify for *Younger* abstention," App. 54; R. Doc. 20, at 5. On the
merits, the district court said Jones Eagle was likely to succeed on at
least some of its claims, but failed to specify which. App. 58; R. Doc. 20,
at 9.

After issuing the temporary restraining order, the district court
held a hearing on Jones Eagle's preliminary-injunction motion. Jones
Eagle offered testimony from Chen to try to show irreparable harm. As
in his declaration, Chen primarily testified that were Act 636 or 174 to

be enforced against Jones Eagle, it would cause Jones Eagle to shut down its data center and lose clientele that it could not recover. 12/04/2024 Tr. 76–77. Chen also suggested that Acts 636's and 174's mere existence harmed Jones Eagle, because the "public investigation into Jones Eagle" was "all over the news," "affects our potential clients," 12/04/2024 Tr. 81:7–9, and potentially depressed the price of the company in a sale, 12/04/2024 Tr. 81:11–19.

Five days after the hearing, the district court enjoined Secretary Ward and Attorney General Griffin from enforcing Acts 636 and 174. The district court first denied Defendants' motion to dismiss on standing and *Younger* abstention grounds. Though Jones Eagle argued that Act 636 did not apply to it, the district court held that Jones Eagle had standing to challenge Act 636 "whether or not" Act 636 applied because it had been sued in a subpoena enforcement proceeding to investigate possible violations of Act 636. Add. 17; App. 78; R. Doc. 35, at 17. That proceeding and the underlying subpoena alone, the district court reasoned, were "real, concrete harm." *Id.*

As to Act 174, the district court said it "may" apply to Jones Eagle. Add. 18; App. 79; R. Doc. 35, at 18. But here too, the district court

ultimately relied on the fact that Jones Eagle was under subpoena for potential violations of Act 174, which the district court deemed conclusive evidence that Jones Eagle faced a credible threat of enforcement of that statute. *Id.* In a footnote, the district court held Jones Eagle's suit was also ripe for the same reasons it held Jones Eagle had standing. Add. 19 n.1; App. 80 n.1; R. Doc. 35, at 19 n.1.

Though the district court held Jones Eagle faced a credible threat of enforcement for standing purposes, in holding that *Younger* did not require abstention, the district court emphasized that the Attorney General had not charged Jones Eagle with "a violation of the underlying law," but only with "failure to comply with the subpoena." Add. 24; App. 85; R. Doc. 35, at 24. Further, it noted that even in the subpoena enforcement proceeding "no substantive outcome had occurred" yet; instead, "there was only 'a possibility of contempt'" depending on whether the state court ordered Jones Eagle to comply, Add. 25, App. 86; R. Doc. 35, at 25 (quoting *Smith & Wesson Brands, Inc. v. Att'y Gen. of N.J.*, 27 F.4th 886, 893–94, 894–95 (3d Cir. 2022)).

Turning to the merits, the district court declined to consider Jones Eagle's facial challenge to Acts 636 and 174, saying that it would consider

only Jones Eagle's as-applied challenge.  Add. 27–28; App. 88–89; R. Doc. 35, at 27–28.  Citing constitutional-avoidance considerations, the district court first turned to addressing Jones Eagle's preemption claims.  Add. 30; App. 91; R. Doc. 35, at 30.

Having limited its review, at least initially, to Jones Eagle's as-applied preemption claims, the district court held that Acts 636 and 174 were likely both conflict-preempted and field-preempted.  Add. 32–39; App. 93–100; R. Doc. 35, at 32–39.  The district court first concluded that Acts 636 and 174 were likely preempted by the Foreign Investment Risk Review Modernization Act of 2018 (FIRRMA), a statute that added a miniscule sliver of real estate transactions involving foreign persons to the ambit of the federal Committee on Foreign Investment in the United States' (CFIUS) review.  Add. 33–35; App. 94–96; R. Doc. 35, at 33–35.  The district court reasoned that because FIRRMA subjected to CFIUS review real estate transactions near federal military bases and other federal property that is sensitive for national-security reasons, it implied that other foreign real estate purchases "ought not be subject to scrutiny." Add. 34; App. 95; R. Doc. 35, at 34.  The district court further reasoned that it was "not hard to imagine a scenario" where CFIUS would approve

a real estate purchase "adjacent to a military facility" that would be blocked by Acts 636 and 174, Add. 35 & n.5; App. 96 & n.5; R. Doc. 35, at 35 & n.5, though the district court was only entertaining Jones Eagle's as-applied challenge and Jones Eagle did not claim the property it had leased was adjacent to a military facility.

The district court next held that Acts 636 and 174 were conflict-preempted by the ITAR list of countries, which Acts 636 and 174's prohibitions of foreign real-estate and digital-asset-mining investments incorporated by reference. Add. 35–36; App. 96–97; R. Doc. 35, at 35–36. The district court observed that the ITAR list, which the State Department wrote under congressional authorization in the Arms Export Control Act, served only the purpose of limiting defense exports. Add. 36; App. 97; R. Doc. 35, at 36. From that it said it followed that Acts 636's and 174's incorporation of the ITAR list for other purposes "conflict[ed] with the determination of Congress and the State Department" that the only restrictions that should be placed on the countries on the ITAR list were defense export controls. *Id.*

Turning to field preemption, the district court claimed (following Ninth Circuit precedent) that a state law was preempted by the federal

government's foreign affairs power—even absent any conflict with federal law or policy—whenever "'the real purpose' of the state policy at issue does not concern an area of traditional state responsibility," and "it intrudes on the federal government's foreign affairs power." Add. 38; App. 99; R. Doc. 35, at 38 (citing *Gingery v. City of Glendale*, 831 F.3d 1222, 1229 (9th Cir. 2016)). Without explaining why that rule applied here, the district court held in a sentence that "[f]or the reasons stated above in its analysis of Jones Eagle's conflict preemption claim"—which involved a supposed conflict with a specific statute and regulation—"the Court also finds that Jones Eagle is likely to succeed on its field preemption claim under the foreign affairs doctrine with respect to both Acts 636 and 174." Add. 39; App. 100; R. Doc. 35, at 39. Having found Jones Eagle was likely to succeed on its preemption claims, the district court "decline[d] to make any ruling on Jones Eagle's other constitutional claims." *Id.*

Turning to irreparable harm, the district court found Jones Eagle faced irreparable harm "in the form of damage to reputation and goodwill" because it was the subject of an investigation and subpoena under Acts 636 and 174. Add. 40; App. 101; R. Doc. 35, at 40. It offered no

detail of how the subpoena had damaged Jones Eagle's reputation or business. It also asserted that Jones Eagle and Chen "risk imprisonment, fines and judicial foreclosure" were Acts 636 and 174 to be enforced against them, though it made no finding that it was likely that either statute ultimately would be enforced against Jones Eagle. Add. 41; App. 102; R. Doc. 35, at 41. It further concluded that these ostensibly irreparable harms outweighed the harm to the State, reasoning that the State "ha[d] no interest" in enforcing laws that the district court believed were likely preempted. *Id.* It held an injunction would serve the public interest for the same reason. Add. 42; App. 103; R. Doc. 35, at 42. Having only entertained Jones Eagle's as-applied challenge, the district court solely enjoined Secretary Ward and Attorney General Griffin from enforcing Acts 636 and 174 against Jones Eagle. Add. 43; App. 104; R. Doc. 35, at 43.

Defendants timely appealed the district court's order on January 7, 2025. App. 60; R. Doc 44.

## SUMMARY OF THE ARGUMENT

The district court's injunction should be reversed for three main reasons. Jones Eagle's challenge to Acts 636 and 174 is unripe because it does not yet face a credible threat of enforcement of those statutes, but only an as-yet unenforced investigative subpoena that seeks to determine whether or not Jones Eagle is violating those statutes. On the merits, Jones Eagle's preemption claims are unlikely to succeed. Its conflict-preemption claim rests on implausible inferences from silence in federal regulations of entirely disparate subject matter, and its field-preemption claim fails because foreign affairs field preemption is limited under Supreme Court precedent to state laws that, in application, invite judicial scrutiny of foreign governments. Finally, Jones Eagle failed to prove irreparable harm. All it offered was vague, conclusory testimony about supposed negative impacts on its goodwill—and almost all of the testimony amounted to speculation about the hypothetical effect on Jones Eagle's business in the event Acts 636 and 174 were enforced against Jones Eagle, which depends on the outcome of the Attorney General's investigation.

The district court's reasoning on *Younger* abstention underscores why it should have dismissed Jones Eagle's suit for lack of ripeness. The district court found *Younger* inapplicable because (1) Defendants sought to enforce only a subpoena, not Act 636 or 174 themselves, and (2) within the subpoena enforcement action "no substantive outcome had occurred" yet. Add. 25; App. 86; R. Doc. 35, at 25 (quoting *Smith & Wesson*, 27 F.4th at 893–94). Those two circumstances are precisely why Jones Eagle's suit is not ripe. Whether Acts 636 and 174 will ever be enforced against Jones Eagle depends on two contingencies: (1) the state court orders Jones Eagle to respond to the subpoena notwithstanding its challenge to those statutes, and (2) the information Jones Eagle produces indicates a violation of Act 636 or 174. Until at least the state court orders Jones Eagle to respond to the subpoena, Jones Eagle has no present injury, nor a credible threat of future enforcement. It is therefore unsurprising that some of the key cases on which the district court relied to deny *Younger* abstention hold that suits attacking state-court subpoenas before they have been enforced are unripe.

The district court erred on the merits too: Acts 636 and 174 are not conflict-preempted. The district court's theory of conflict preemption is

that Acts 636 and 174 impermissibly regulate things federal law, namely, FIRRMA and ITAR, does not.  Federal law can occasionally preempt state regulation by opting not to regulate.  But for it to do so, absent express preemption, two things must be true.  First, federal law has to otherwise regulate the same activity that the state law regulates.  Second, leaving that activity partially unregulated has to be an objective of federal law, not just a function of inaction, or a decision that some aspects of the activity do not merit regulation at the federal level.

Neither is true here.  Neither FIRRMA nor ITAR generally regulates foreign real-estate or business investment, but only miniscule pockets of foreign investment that are far afield from the kinds of investments Acts 636 and 174 regulate.  And neither FIRRMA nor ITAR contains any indicia of intent to displace state regulation of alien property ownership.  States have regulated—and been the principal regulators of—alien property ownership since the Founding, subject only to occasional preemption by treaties with specific nations.  FIRRMA's inclusion of a tiny sliver of national-security-sensitive real estate transactions within CFIUS review did not displace that tradition.  Tellingly, Congress left intact a far broader prohibition on alien ownership of land in territories and federal

enclaves, while continuing to leave alien ownership of land in States to the States. And the State Department's promulgation of the ITAR list of countries that may not receive arms exports was not intended to preempt any other restrictions on dealings with those countries or their nationals. Indeed, the State Department was solely delegated authority in the Arms Export Control Act to craft an arms-control list, not to restrict trade more broadly.

Acts 636 and 174 also are not field-preempted. The district court, following Ninth Circuit precedent, announced a sweepingly broad theory of foreign affairs field preemption. Under this theory, *any* state law that does not concern an area of traditional state responsibility and has more than an incidental effect on foreign countries is preempted by the federal government's foreign affairs power—whether or not it conflicts with any federal law or policy.

That is not the law. The Supreme Court's only foreign affairs field-preemption case, *Zschernig v. Miller*, held that state laws were preempted if the laws' application entailed judicial criticism and scrutiny of foreign governments. And since that decision, the Supreme Court has not only held that *Zschernig* extends no further, but has also declined to

apply foreign affairs field preemption and questioned whether such preemption exists. *Zschernig*'s narrow rule does not apply here because Acts 636 and 174 do not entail judicial criticism of foreign governments. Unlike the law struck down in *Zschernig*, the countries to which the Acts apply are set forth in the statutes themselves; judges do not decide.

Moreover, even if the district court's broad theory of foreign affairs field preemption were correct, Jones Eagle's claim would still fail. That is because Acts 636 and 174 concern a highly traditional area of state responsibility: alien ownership of real and personal property within the State's borders. That is an area where States have been the principal regulators since the founding.

The district court likewise erred in holding Jones Eagle faced irreparable harm. Absent enforcement of the underlying statutes themselves, the district court's only basis for finding irreparable harm was damage to Jones Eagle's reputation and goodwill stemming from the Attorney General's investigation. But Jones Eagle offered only conclusory assertions that the *investigation* damaged its goodwill, as opposed to the statutes' hypothetical future enforcement damaging its goodwill. Those assertions

are miles away from evidence deemed sufficient to establish irreparable harm based on damage to one's goodwill in past cases.

Finally, the district court incorrectly weighed the balance of the equities. The district court gave no weight to Arkansas's sovereign interest in enforcing its statutes, claiming Arkansas had no such interest based on the court's (incorrect) conclusion that the state laws were likely preempted. But a State's interest in enforcing its law does not evaporate merely because a district court holds a plaintiff is likely to prevail in a challenge to it. The district court's analysis was thus flawed across the board, and its judgment should be reversed.

Finally, in the alternative, the district court's injunction should be vacated as overbroad. The district court enjoined Defendants from enforcing any provision of Act 174. But it only held that Act's restriction on foreign ownership of digital asset mining businesses was likely preempted, saying nothing about the balance of the Act, which instituted a permitting regime for foreign- and non-foreign-owned digital asset mining businesses alike. At minimum, its injunction against enforcement of those unchallenged provisions cannot stand.

# ARGUMENT

## I. STANDARD OF REVIEW

This Court generally reviews preliminary injunctions for abuse of discretion, but "[w]hen purely legal questions are presented," it gives "no special deference to the district court" and reviews its legal determinations de novo. *St. Louis Effort for AIDS v. Huff*, 782 F.3d 1016, 1021 (8th Cir. 2015) (reviewing a preemption-based injunction).

The underlying preliminary-injunction standard requires Jones Eagle to make a "clear showing" that each preliminary-injunction factor favors it. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008). And on the likelihood-of-success factor, Jones Eagle was required to make a "more rigorous showing" than usual "that [it was] likely to prevail on the merits" in order to obtain an injunction blocking enforcement "of a duly enacted state statute." *Planned Parenthood of Ark. & E. Okla. v. Jegley*, 864 F.3d 953, 957–58 (8th Cir. 2017) (citing *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732-33 (8th Cir. 2008) (en banc)).

## II. JONES EAGLE'S CLAIMS ARE NOT RIPE.

Because Jones Eagle's claims, and the district court's standing theory, rest only on the Attorney General's state-court action to enforce his investigative subpoena, Jones Eagle's claims are unripe. The district

court held that enforcement action (filed five days before Jones Eagle filed this suit) gave Jones Eagle injury in fact and made its claims ripe. Add. 17–19; App. 78–80; R. Doc. 35, at 17–19; Add. 19 n.1; App. 80 n.1; R. Doc. 35, at 19 n.1. But the existence of a subpoena enforcement action does not make this suit ripe—as explained in the case that is central to the district court's *Younger* holding.

In explaining why it was not required to abstain under *Younger* and distinguishing precedent of this Court that was arguably to the contrary, the district court primarily relied on a Fifth Circuit decision that holds challenges to state investigative subpoenas that have not yet been successfully enforced are unripe. Add. 25; App. 86; R. Doc. 35, at 25 (citing *Google, Inc. v. Hood*, 822 F.3d 212, 224 n.7 (5th Cir. 2016)). Many of the same reasons the Fifth Circuit gave for rejecting the State's plea for *Younger* abstention there ultimately supported the court's conclusion that the suit was not ripe—absent successful enforcement of the subpoena, there is nothing to abstain from and also not yet any injury. So under the district court's own logic (and authority) for denying *Younger* abstention, it should have held this suit was unripe.

Jones Eagle filed this federal suit five days after the Attorney General sued to enforce a non-self-executing investigative subpoena in state court. Jones Eagle did not wait to see what that enforcement action's outcome would be. Instead, it sued to enjoin the Attorney General from prosecuting that suit, making the same arguments about the invalidity of Acts 174 and 636 that it could have made in state court to oppose enforcement. Under those circumstances this suit is not ripe because "this Court cannot yet know whether the state court . . . will, in fact, enforce the [s]ubpoena in its current form," which means "no actual or imminent injury has occurred." *First Choice Women's Res. Ctrs., Inc. v. Platkin*, Civ. No. 23-23076, 2024 WL 150096, at *4 (D.N.J. Jan. 12, 2024). Or as the district court itself explained in denying *Younger* abstention, "'no substantive outcome ha[s] occurred' in the form of a court order" in the state-court action; so far there is "only 'a possibility of contempt.'" Add. 25; App. 86; R. Doc. 35, at 25 (quoting *Smith & Wesson*, 27 F.4th at 893–94, 894–95).

The question of whether challenges to non-self-executing subpoenas are ripe before a state court enforces them is an emerging area of the law. A recent petition for certiorari claims that only three courts of

appeals have addressed the question, all in the last decade.  Pet. for Writ of Certiorari at 16–18, *First Choice Women's Res. Ctrs., Inc. v. Platkin* (No. 24-781), 2025 WL 335257, at \*16–19.[1]  The leading case is the Fifth Circuit's decision in *Google*.  There, the Fifth Circuit explained that under a well-settled body of law—including decisions of the Supreme Court and this Court—challenges to federal administrative subpoenas are unripe until those subpoenas are enforced, and subpoena recipients can litigate the validity of the subpoena in those enforcement proceedings. *Google*, 822 F.3d at 225 (citing *Anheuser-Busch, Inc. v. F.T.C.*, 359 F.2d 487 (8th Cir. 1966) (Blackmun, J.); *Reisman v. Caplin*, 375 U.S. 440 (1964)).  The Fifth Circuit "s[aw] no reason why a state's non-self-executing subpoena should be ripe for review when a federal equivalent would not be." *Id.* at 226.  It reasoned that, if anything, "comity should make [federal courts] less willing to intervene when there is no current consequence for resisting the subpoena and the same challenges raised in the federal suit could be litigated in state court." *Id.*  And though the suit was brought before the State even sought enforcement in that case, the

---

[1] That petition incorrectly claims there is a circuit split on the issue, relying on a Ninth Circuit decision that is actually in accord with the consensus view.  *See infra* at 25.

Fifth Circuit indicated that it would not be ripe until a state court actually enforced the subpoena. *Id.* at 225. It not only reasoned that Google could "raise its objections to the . . . subpoena" in the "enforcement proceeding" were one brought, *id.*, but it also distinguished as justiciable only cases brought after a state court enforced a subpoena and threatened contempt, *id.* at 225 n.9.

The courts to consider the question have generally followed *Google*. The Sixth Circuit has agreed pre-enforcement challenges to state subpoenas are unripe, explaining that the recipient "can challenge the scope of [the] subpoena in a subpoena-enforcement action." *CBA Pharma, Inc. v. Perry*, No. 22-5358, 2023 WL 129240, at *4 (6th Cir. Jan. 9, 2023). And while the Ninth Circuit has reserved the question of whether an unenforced subpoena in a First Amendment case might sufficiently chill speech to support standing, *see Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1178 & n.3 (9th Cir. 2022), it has otherwise held that suits based on unenforced subpoenas are "constitutionally unripe." *Id.* at 1179. It explained that their recipients "ha[ve] not suffered an Article III injury" because "enforcement is no rubber stamp." *Id.* at 1176.

District courts have likewise agreed with the Fifth Circuit's reasoning. For example, one district court agreed "that a state's non-self-executing subpoena is not legally distinguishable" for purposes of ripeness "from the federal equivalent" and held that a challenge to a subpoena had become ripe only because the plaintiff "ha[d] been compelled to comply" with the subpoena by the state court. *Exxon Mobil Corp. v. Schneiderman*, 316 F. Supp. 3d 679, 695 (S.D.N.Y. 2018). Another district court explained why challenges to as-yet-unenforced subpoenas do not satisfy Article III—even if an enforcement action is pending—in a scholarly opinion affirmed by the Third Circuit. It reasoned that until the state court "adjudicate[s] a subpoena recipient's constitutional arguments," orders the recipient to respond, and threatens it with contempt, the recipient "has not yet suffered any cognizable injury." *First Choice Women's Res. Ctrs., Inc. v. Platkin*, Civ. No. 23-23076, 2024 WL 4756044, at *12 (D.N.J. Nov. 12, 2024), *aff'd sub nom. First Choice Women's Res. Ctrs., Inc. v. Att'y Gen. of N.J.*, No. 24-3124, 2024 WL 5088105 (3d Cir. Dec. 12, 2024) (per curiam). Unless and until that chain of events happens, the recipient's injury is only "conjectural or hypothetical" because it depends on whether the state court will enforce the subpoena. *Id.* at *12 n.20.

Notably, in reaching that conclusion the district court relied on the same Third Circuit precedent the district court here relied on to deny *Younger* abstention. *See* Add. 23–25; App. 84–86; R. Doc. 35, at 23–25 (citing *Smith & Wesson Brands, Inc.*). But unlike the court below, that district court correctly recognized that the Third Circuit's rationale for why *Younger* abstention is inappropriate before a subpoena's enforcement "lays bare the lack of concrete injury" plaintiffs face in that posture. *First Choice Women's Res. Ctrs., Inc.*, 2024 WL 4756044, at *14.

That logic applies here. The district court reasoned that "whether or not Jones Eagle is actually in violation of Act 636's terms," and even though Jones Eagle "argue[d] that [Act 636] should not apply to it," it "face[d] a credible threat of prosecution" under Act 636 merely because it had been subpoenaed in an investigation of a possible Act 636 violation. Add. 17; App. 78; R. Doc. 35, at 17. It found standing on the same grounds with respect to Act 174. Add. 18–19; App. 79–80; R. Doc. 35, at 18–19. But it is speculative, at best, whether Jones Eagle would be prosecuted upon production of the documents the subpoena demands, especially when Jones Eagle claims those documents would show that at least one of the challenged statutes does not apply. And it is also speculative

whether the state court will ever order Jones Eagle to produce those documents. If the state court agreed with Jones Eagle's challenge to the statutes, or quashed the subpoena on other grounds, Jones Eagle would not have to produce them. As of now, Jones Eagle's only "injury" is having to defend against the subpoena's enforcement—which is precisely what it is already doing, in a different forum, by bringing this action.

## III. JONES EAGLE IS UNLIKELY TO SUCCEED ON ITS PREEMPTION CLAIMS.

### A. Acts 636 and 174 Are Not Conflict-Preempted.

The district court's rationale for why Acts 636 and 174 are conflict-preempted was incorrect, but simple: the Acts regulate foreign investments that more narrowly targeted federal laws do not, so they are preempted. Whereas federal law regulates foreign purchases of real estate near ports, military installations, and other similarly sensitive federal facilities, Act 636 regulates foreign investment in Arkansas farmland. Whereas federal law regulates foreign investment in critical infrastructure and technologies that are important to the security of the Nation as a whole, Act 174 regulates foreign ownership of digital asset mining equipment. Rather than conclude the dramatic mismatch between the kinds of investment that federal law and Arkansas's statutes regulate

meant federal law did not preempt Arkansas's statutes, the district court held that Arkansas's statutes conflicted with Congress's supposed judgment that the kinds of investments Arkansas regulated should "not be subject to scrutiny." Add. 34; App. 95; R. Doc. 35, at 34. That is a non sequitur. What federal law's silence on the bulk of real-estate and commercial foreign investment shows is that Congress left the traditional field of regulating alien ownership of real estate and personal property to States, deeming only investments that affected national security appropriate subjects for federal regulation.

1. **Congressional inaction can only conflict-preempt state regulation when Congress regulates the activity it leaves partially unregulated, and leaving the activity partially unregulated is a significant objective of federal law.**

The district court's conflict-preemption holding was based on congressional inaction; because Congress has not regulated foreign ownership of farmland or digital asset mining equipment, States cannot regulate foreign ownership of those kinds of property either. On rare occasion preemption can work that way; sometimes "a federal decision to forgo regulation in a given area may imply an authoritative federal determination that the area is best left *un*regulated." *Ark. Elec. Coop. Corp. v.*

29

*Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 384 (1983). But far more often, a federal decision not to regulate an area is merely a decision that *federal law* should not regulate it, and does not preempt state regulation. *See, e.g.*, *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 768 (2019) (holding statute that gave the Nuclear Regulatory Commission jurisdiction to regulate "nearly every aspect of the nuclear fuel life cycle *except* mining" did not preempt state regulation of uranium mining); *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373 (2015) (holding statute that limited FERC's jurisdiction to regulating wholesale natural gas prices did not preempt state regulation of retail natural gas prices); *Cal. Div. of Lab. Standards Enf't v. Dillingham Const., N.A., Inc.*, 519 U.S. 316, 330 (1995) (rejecting as "unsettling" a reading of ERISA to preempt state law in "areas where ERISA has nothing to say"); *Pharm. Rsrch. & Mfrs. of Am. v. McClain*, 95 F.4th 1136, 1143–45 (8th Cir. 2024) (holding state statute that regulated pharmacy distribution of drugs within a federal drug program was not preempted by that program because it did not regulate pharmacy distribution).

Accordingly, to find preemption of state law it never suffices just to find that federal law does not regulate the same conduct, or even that

Congress deliberately left that conduct unregulated. Instead, to infer preemption from non-regulation courts must find that leaving that conduct unregulated "was a *significant objective* of federal law." *Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323, 330 (2011) (holding that a federal regulation that expressly gave carmakers a choice between two kinds of seat belts did not preempt state tort suits that would require one because manufacturer choice was not a significant objective of the regulation).

To decide whether non-regulation was an objective of federal law, rather than mere silence, courts ask two questions. First, they ask whether Congress otherwise regulated the "basic subject" it left partly unregulated. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 380 (2000) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 63 (1941)). *Crosby*, one of just two modern Supreme Court foreign-affairs conflict-preemption cases, illustrates this dynamic. In *Crosby*, federal law imposed sanctions on Burma and trade with Burma. *Id.* at 368–69. Several months prior, Massachusetts enacted its own Burma sanctions statute that "penalize[ed] individuals and conduct that Congress has explicitly exempted or excluded from sanctions." *Id.* at 378. The Supreme Court did not view

those exemptions and exclusions as mere silence, because Congress had regulated the "basic subject" of sanctions on Burma, *id.* at 380, and "the same activity," writ large, as Massachusetts's law, *id.* (quoting *Wis. Dep't of Indus. v. Gould, Inc.*, 475 U.S. 282, 286 (1986)).  Instead, given that Congress had regulated that activity, the Court viewed the exemptions and exclusions as a part of a "calibrated Burma policy," *id.* at 377–78, that were deliberately "drawn . . . to allow what they permit[ted]," *id.* at 380.  Thus, Massachusetts's law was "at odds with . . . the federal decision about the right degree of pressure to employ." *Id.*

Second, as *Crosby* itself illustrates, merely regulating the same basic subject of an unregulated activity is not enough to deem the lack of regulation preemptive.  Ultimately, to find preemption a court must find that the zone of non-regulation was affirmatively "drawn . . . to allow what [it] permit[s]." *Id.* at 380.  The Supreme Court's car-safety preemption cases illustrate the distinction particularly clearly.  In *Geier v. American Honda Motor Co.*, the Court held that a regulation that gave carmakers a choice between airbags and other passive restraint systems preempted state tort suits that would require airbags.  529 U.S. 861 (2000).  Yet the choice alone was not enough.  Rather, the Court found

preemption only because it concluded the regulation "sought"—not just permitted—a "mix of devices" on the view that "safety would best be promoted" by a mix. *Id.* at 881. In *Williamson*, the Court again confronted a regulation that gave carmakers a choice, there between two different types of seat belts. But there the Court did not find preemption. The Court explained that the agency had not affirmatively "sought to maintain manufacturer choice," *id.* at 336; it merely declined to require the safer belt because it concluded federally mandating it would not "be cost effective." *Id.* at 335. That judgment that the marginal safety benefits were not worth the cost a federal mandate would impose did not forbid States from "reach[ing] a different conclusion." *Id.*

### 2. States have traditionally regulated alien property ownership.

Under that demanding standard, Congress's silence on foreign ownership of farmland and digital asset mining businesses easily does not preempt Acts 636 and 174. To start, state regulation of foreign property ownership is not a novelty; it is a centuries-long tradition in American law. *See* James A. Frechter, *Alien Landownership in the United States: A Matter of State Control*, 14 Brook. J. Int'l L. 147, 152–55 (1988) (tracing the history back to the American Revolution). At common law, aliens

could own but not convey real property or pass title to it by descent, *see id.* at 150–51, a restriction which continued to the modern era absent displacement by treaty or statute, *id.* at 151 n.33 (collecting cases).

When positive law modified that common-law rule, either more or less restrictively, the law that did so was overwhelmingly state law. As the Supreme Court said in a landmark 1923 opinion rejecting equal protection challenges to state alien land laws, "while Congress has exclusive jurisdiction over . . . the disposal of the public domain, each state, in the absence of any treaty provision to the contrary, has power to deny aliens the right to own land within its borders." *Terrace v. Thompson*, 263 U.S. 197, 217 (1923); *see Blythe v. Hinckley*, 180 U.S. 333, 340–41 (1901) (explaining that, "in the absence of any treaty," states could "legislate upon the subject and permit aliens to hold property, real and personal, within its borders, according to its own laws" and that the Supreme "[C]ourt has held from the earliest times, in cases where there was no treaty, that the laws of the state where the real property was situated governed the title and were conclusive . . . thereto"); *Hauenstein v. Lynham*, 100 U.S. 483, 485 (1879) ("The law of nations recognizes the liberty of every government to give to foreigners only such rights, touching immovable property

. . . as it may see fit to concede. In our country, this authority is primarily in the States where the property is situated." (citation omitted)).

Federal intervention into this traditional state sphere of regulation historically took two forms. First, in federal lands (territories, public lands, and the District of Columbia), Congress enacted its own alien land ownership restrictions in 1887. 48 U.S.C. §§ 1501–1508. This statute, which exists to the present day, prohibits non-resident aliens from owning land in federal territories and enclaves unless they declare their intention to become citizens. 48 U.S.C. § 1501. Second, the President and Senate used treaties to displace state-law restrictions on alien land ownership for certain favored nations. *See, e.g.*, David M. Golove, *Treaty-Making and the Nation: The Historical Foundations of the Nationalist Conception of the Treaty Power*, 98 Mich. L. Rev. 1075, 1104–10 (2008). Yet even here, treaties that granted nations most-favored-nation status often "*expressly exempt* ownership and devolution of real property from treaty coverage" and "recite that the laws of the several states shall determine alien landholding ability or disability." Frechter, *supra*, at 169–70.

### 3. Congress's creation of the narrow CFIUS review process did not displace that sphere of traditional state regulation.

Congress's creation of the CFIUS review process did nothing to change this regulatory background. In 1988, Congress amended the Defense Production Act to create CFIUS review. As originally enacted, a committee of the highest-level Cabinet members was tasked with reviewing "the effects on national security of mergers, acquisitions and takeovers" of American businesses by foreign nationals or companies. *See* Pub. L. No. 100-418, tit. V, § 5021 (1988). Thirty years later, in FIRRMA, Congress amended the CFIUS statute to provide review of foreign real estate purchases within air or maritime ports, or in close proximity to United States military installations or other federal properties that are "sensitive for reasons relating to national security." 50 U.S.C. § 4565(a)(4)(B)(ii). It defined "close proximity" to "refer[] only to a distance . . . within which" a purchase "could pose a national security risk." *Id.* § 4565(a)(4)(C)(ii). It otherwise left real estate purchases untouched. The practical effect of this amendment is that by 2023, the last year for which there is reporting, CFIUS reviewed five real estate transactions in the entire country. *See* CFIUS, Annual Report to Congress—Report

Period: CY 2023 at 4, 14 (2024), https://home.treasury.gov/system/files/206/2023CFIUSAnnualReport.pdf.

In creating this extremely narrow review of foreign purchases of real estate that pose national security risks, Congress did not sweep away over two centuries of state law on alien ownership of real and personal property outside that narrow context. To start, CFIUS review as modified by FIRRMA does not regulate the same basic subject or activity that traditional state alien property ownership restrictions do. Instead, it regulates the far narrower subject of real estate purchases near sensitive federal installations that threaten national security. Accordingly, it is impossible to view a scheme in which a committee of the highest-ranking Cabinet members reviews fewer than ten real estate transactions a year near federal military bases as a congressional judgment that every other foreign purchase of property in the country should go unregulated at the state level. Rather, Congress's addition of that infinitesimal sliver of real estate transactions to CFIUS review merely shows that it thought those transactions that "could pose a national security risk," *id.* § 4565(a)(4)(C)(ii), were the ones sufficiently important to be regulated at the federal level by Cabinet-level officials. Likewise, the exclusion of

single housing units or "real estate in 'urbanized areas,'" even within the national-security perimeter, from CFIUS review, *id.* § 4565(a)(4)(C)(i), hardly reflects a congressional judgment that no level of government should ever regulate foreign real estate purchases in urban areas, but only that *CFIUS* need not given its limited role.

Second, Congress's inaction with respect to other forms of alien property ownership regulation shows that its amendment to CFIUS review did not reflect an objective to leave alien property ownership outside CFIUS review unregulated. If Congress believed that only those select foreign purchases covered by CFIUS review should be regulated, it would have repealed its general prohibition on land ownership by aliens in territories and federal enclaves. But it did not; that 1887 statute remains the law to this day. And the fact that Congress has only regulated alien property ownership in territories and federal lands, rather than passing a statute for the country, shows that it intended to leave the field of alien property ownership in States to state law. Likewise, the President did not stop signing and the Senate did not stop ratifying treaties after CFIUS was enacted that expressly displaced state law on foreign property ownership—restrictions that would be unnecessary if CFIUS had

already impliedly preempted them. *See*, *e.g.*, Treaty Concerning the Encouragement and Reciprocal Protection of Investment, Mozam.-U.S., Dec. 1, 1998, arts. I(d)(iv), II(1), T.I.A.S. No. 13006, at 2–4; Treaty Concerning the Encouragement and Reciprocal Protection of Investment, Alb.-U.S., Jan. 11, 1995, arts. I(1)(d)(iv), II(1), XV(1)(a), T.I.A.S. No. 98-104, at 2–4, 12.

Third, where, as here, Congress was well aware of "longstanding state regulation of alien landownership," *Shen v. Simpson*, 687 F. Supp. 3d 1219, 1250 (N.D. Fla. 2023) (upholding a similar law to Act 636), Congress's failure to enact an express preemption clause strongly suggests it did not view that regulation as conflicting with CFIUS. Congress knows about state regulation of alien landownership. The Senate has ratified treaties that either preempt it or except it from preemption of other types of foreign-investment regulation since the founding, and over a century ago Congress enacted its own statute to address alien property ownership in the territories, while otherwise leaving the field open to the States. Yet at no point since CFIUS's enactment has it preempted state regulation of transactions outside CFIUS's jurisdiction, or even those within it. Congress's "silence on the issue, coupled with its . . . awareness of the

prevalence of state" regulation, "is powerful evidence that Congress did not intend" CFIUS review to be the sole source of regulation of alien property ownership. *Wyeth v. Levine*, 555 U.S. 555, 575 (2000); *see Shen*, 687 F. Supp. 3d at 1250 (applying *Wyeth*'s logic to hold the lack of an express preemption provision in CFIUS indicates congressional tolerance of state regulation).

> ### 4. The State Department's creation of the ITAR list of arms-exports-restricted countries did not displace state regulation of property ownership by nationals of countries on the ITAR list.

The district court also held that Acts 636 and 174, by incorporating the ITAR list of countries for purposes other than that list is used in the ITAR regime, is preempted by the ITAR list. As the district court saw it, subjecting nationals of those countries to restrictions in buying farmland or digital asset mining businesses was inconsistent with a decision by Congress and the State Department (the latter of which writes the list by regulation) to subject those countries only to defense export controls. Add. 36; App. 97; R. Doc. 35, at 36. That fundamentally misunderstands ITAR. ITAR is not a sanctions regime, like the law in *Crosby*, that selectively limits sanctions to defense export controls. Instead, it merely reflects a judgment by the State Department that the countries it covers

are inappropriate recipients of defense exports. It does not reflect a judgment that any other restrictions on those countries are inappropriate.

To start, the district court overlooked the two-step process by which the ITAR list was created when it interpreted ITAR as containing a negative implication that non-defense restrictions on the ITAR countries are inappropriate. Congress did not simply enact a statute that prohibited defense exports to such countries as China, Iran and North Korea, *see* 22 C.F.R. § 126.1(d)(1) (placing those countries on the list), in the same way it sanctioned Burma in *Crosby*. Rather, as the district court noted, *see* Add. 33; App. 94; R. Doc. 35, at 33, under the Arms Export Control Act of 1976, Congress charged the President with controlling defense exports. 28 U.S.C. § 2778. The President has chosen to act through the State Department, *see* 78 Fed. Reg. 16,129, 16,130 (Mar. 8, 2013), which creates a list of countries—the ITAR list—to which arms may not be exported. So on the one hand, ITAR does not reflect a judgment by *Congress* that the countries on the ITAR list should be subject only to defense export restrictions, as it did not create the ITAR list. It only reflects Congress's judgment that the Executive Branch should restrict arms exports to the countries it deems appropriate. On the other hand, ITAR also does not

reflect the State Department's judgment that the countries on the ITAR list should be subject only to defense export restrictions, as it has no authority to apply that list more broadly under ITAR. After all, the State Department is simply charged with creating a list of countries to which arms should not be exported.

Yet even if Congress had enacted the ITAR list, or an agency with the ambit to restrict trade more broadly wrote the ITAR list, the fact that the Government created a list of countries to which arms may not be exported would not imply that those countries may not be subjected to other restrictions. Indeed, it strains credulity to think that China's or Iran's or North Korea's placement on the ITAR list suggests that Congress or the State Department believes those countries should be subject only to arms-export restrictions. *See, e.g.*, *TikTok Inc. v. Garland*, 145 S. Ct. 57 (2025) (upholding federal statute requiring social media platform to divest from control by China). All that ITAR means is what it says: the countries on its list are inappropriate recipients of American arms. Put another way, ITAR fails *Crosby*'s same basic subject test. Whereas in *Crosby* both Congress and Massachusetts legislated on the basic subject of a sanction regime for Burma, here the claim is that ITAR's targeted

arms export controls preempt statutes on the entirely different subjects of owning farmland and digital asset mining businesses, merely because the same countries are involved.

Moreover, no rule of preemption says that States may not incorporate federal law for their own purposes. To the contrary, the Supreme Court and this Court have held that States may even create a mandatory version of a voluntary federal program, *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 608–09 (2011), or place obligations on federal program participants that the federal program itself does not, *Pharm. Rsrch. & Mfrs. of Am.*, 95 F.4th at 1144–45 (upholding Arkansas law requiring drug manufacturer participants in federal drug program to deliver drugs to pharmacies contracting with hospital participants in federal program, precisely *because* of the program's silence on the matter). Under the district court's rationale, Acts 636 and 174 would be less subject to challenge if Arkansas had devised its own list of countries whose nationals may not purchase Arkansas farmland or digital asset mining businesses. But the fact that the challenged statutes track federal policy judgments instead of containing their own make them less subject to preemption challenge, not more. *See Fac. Senate of Fla. Int'l Univ. v. Winn*, 616 F.3d 1206, 1211

(11th Cir. 2010) (per curiam) (upholding state statute limiting state employees' travel to countries the federal government listed as state sponsors of terrorism *because* "Florida accepts altogether the list published by the Executive Branch.").

## B.    Acts 636 and 174 Are Not Field-Preempted.

The district court also wrongly held in two paragraphs that Acts 636 and 174 are likely field-preempted, not by any statute, but by "the federal government's foreign affairs power." Add. 38; App. 99; R. Doc. 35, at 38. The district court did not explain why it thought Acts 636 and 174 were field-preempted by that power, paradoxically stating only that it reached that conclusion "[f]or the reasons stated . . . in its analysis of Jones Eagle's conflict preemption claim" regarding conflicts with FIRRMA and ITAR. Add. 39; App. 100; R. Doc. 35, at 39. But it did express some views on the scope of foreign affairs field preemption. According to the district court, that doctrine is violated when "the 'real purpose' of the state policy at issue does not concern an area of traditional state responsibility," and—somewhat circularly—"it intrudes on the federal government's foreign affairs power" by having more than "some

incidental or indirect effect in foreign countries." Add. 38–39; App. 99–100; R. Doc. 35, at 38–39.

Arkansas's laws would pass muster under that test even if it were the law, but it is not. The district court borrowed the standard it applied from the Ninth Circuit; it is not the one the Supreme Court has announced for foreign affairs field preemption. Rather, in the only case where the Court ever applied the doctrine, it held that a law under which state courts made "minute inquiries" into the conduct of foreign nations to decide how to treat their nationals was preempted. *Zschernig v. Miller*, 389 U.S. 429, 435 (1968). That rule does not apply here, where Arkansas has simply borrowed a list of countries from a federal regulation.

The district court depicted foreign affairs field preemption as a well-established doctrine, but in modern times the Supreme Court has been extremely reluctant to apply it. In *Crosby*, having found that Massachusetts's law was in conflict with the Burma Act, the Court "decline[d] to speak to field preemption." 530 U.S. at 374 n.8. In *American Insurance Association v. Garamendi*, 539 U.S. 396 (2003), the Court not only declined to apply foreign affairs field preemption but questioned whether it even existed. It discussed at length both the *Zschernig* majority's field-

preemption theory and the concurrence's view that foreign affairs preemption required conflict with federal law or policies, without expressing a view on which was correct. *Id.* at 417–19. It also suggested in dicta that at least where a State acted within its "'traditional competence'" it "might make good sense to require a conflict" even if the State's law "affects foreign relations," *id.* at 419 n.11 (quoting *Zschernig*, 389 U.S. at 459 (Harlan, J., concurring in the result)), and then concluded that it was unnecessary to make a "choice between the[se] contrasting theories of field and conflict preemption" because the law at issue was conflict-preempted, *id.* at 419. To be sure, *Garamendi* did not overrule *Zschernig*, even though it cast doubt on it. But it is important not to mistake *Zschernig*, which the Supreme Court has declined to apply since, for a larger doctrine of field preemption that applies beyond the fairly unique facts of that case.

*Zschernig* involved a Cold War-era challenge by residents of East Germany to an Oregon law that said nonresident aliens could not inherit property in Oregon unless their country provided a reciprocal right to U.S. citizens to inherit property there. 389 U.S. at 430. The validity of such laws was not a new question; 20 years prior the Court had upheld a

California statute that, "on its face," *id.* at 433, said the same thing. In that case, the Court rejected as "extraordinary" and "far fetched" the argument that a State's regulation of aliens' personal property rights "was, in absence of a treaty, a forbidden entry into foreign affairs." *Clark v. Allen*, 331 U.S. 503, 517 (1947).

*Zschernig* did not overrule *Clark*, but instead reaffirmed that "a general reciprocity provision requiring just matching of laws" was permissible if States accepted foreign nations' representations about their law. *Zschernig*, 389 U.S. at 433 n.5. But revisiting reciprocity laws at the height of the Cold War, it held that "the Oregon statute as applied," *id.* at 434, had led Oregon state courts to "launch[] inquiries into the types of governments that obtain in particular foreign nations," *id.* at 433–34, and make "minute inquiries concerning . . . the credibility of foreign diplomatic statements," *id.* at 435; *see Garamendi*, 539 U.S. at 417 (explaining that *Zschernig* turned on these facts). The result of this particular application of the Oregon statute and others like it, the Court concluded, was a "notorious" "practice of state courts" to selectively deny property rights to "legatees residing in Communist countries."

*Zschernig*, 389 U.S. at 440.[2]  That practice had a "direct impact upon foreign relations," *id.* at 441, and accordingly was preempted by "the superior federal policy," *id.*

After *Zschernig* was decided, courts uniformly read it as limited to statutes that in application invited judicial examination and criticism of foreign governments.  Most notably, just four years after *Zschernig*, the Supreme Court summarily affirmed a three-judge district court that upheld Nebraska's outright ban on alien land ownership more than three miles outside any city or town.  *Shames v. Nebraska*, 323 F. Supp. 1321 (D. Neb. 1971), *aff'd*, 408 U.S. 901 (1972).  The district court, in an opinion joined by Chief Judge Lay of this Court, reasoned that "every court which has considered *Zschernig*, has interpreted it to mean that judicial criticism of foreign governments is constitutionally impermissible, and the decision extends no further than that."  *Id.* at 1332.  Nebraska's law did not violate that rule because state courts applying it would not be

---

[2] For example, the Court cited instances of state-court judges denying Soviet and Eastern Bloc nationals' claims under reciprocity laws on the ground that "when it comes to Communism I'm a bigoted anti-Communist," or that "sending American money to a person within the borders of an Iron Curtain country is like sending a basket of food to Little Red Ridinghood in care of her 'grandmother'" (i.e., the Big Bad Wolf).  *Id.* at 437 n.8.

called on to make "judicial comment of any kind about foreign govern-ments"; they would simply apply the ban on non-urban alien land owner-ship. *Id.*

The Supreme Court's summary affirmance in *Shames*, whose entire rationale was that *Zschernig* was limited to judicial scrutiny of foreign governments, is binding on this Court. Absent "doctrinal developments indicat[ing] otherwise . . . the lower courts are bound by summary deci-sions by [the Supreme] Court 'until such time as the Court informs them that they are not.'" *Hicks v. Miranda*, 422 U.S. 322, 344–45 (1975) (al-terations omitted) (quoting *Doe v. Hodgson*, 478 F.2d 537, 539 (2d Cir. 1973)). And no doctrinal developments have expanded *Zschernig* since. To the contrary, the Supreme Court has only declined to apply it and questioned whether its field-preemption theory was correct since it was decided.[3]

---

[3] Courts since *Shames* have continued to read *Zschernig* as *Shames* did. *See Winn*, 616 F.3d at 1211 (reading *Zschernig* to hold laws invalid that in their application depend on "proof about the conduct of a[] foreign gov-ernment" or "judgment[s] about that conduct"); *Trojan Techs., Inc. v. Pennsylvania*, 916 F.2d 903, 913 (3d Cir. 1990) (reading *Zschernig* to hold laws invalid that require state administrative officials or judges applying them to "comment on," and "key their decisions to, the nature of for-eign regimes").

Applying *Zschernig*'s actual rule, this case is easy. Acts 636 and 174 do not call on state courts to judge foreign governments. That is because, unlike the law in *Zschernig*, Acts 636 and 174 say exactly which countries their restrictions apply to: those on the ITAR list. And even if *Zschernig*'s rule could be abstracted to prohibit (contrary to the reading of *Zschernig* in *Shames*) state *legislatures* from making judgments about the conduct of foreign governments, that rule would not be violated either. For the Arkansas General Assembly did not make its own judgments about which countries posed security risks to Arkansas farmland or digital mining businesses; it used the federal ITAR list. *See Winn*, 616 F.3d at 1211 (distinguishing *Zschernig* on the ground that a Florida restriction incorporating a federal list of state sponsors of terrorism did not "mak[e] a judgment" about foreign "conduct which is apart from the federal government's own announced judgment," but rather "accept[ed] altogether the list published by the Executive Branch").

The district court, however, claimed the foreign-affairs field-preemption doctrine is far broader. Relying on Ninth Circuit precedent, it concluded that doctrine forbids any state law whose "real purpose" "does not concern an area of traditional state responsibility" and that

"intrudes on the federal government's foreign affairs power." Add. 38; App. 99; R. Doc. 35, at 38 (citing *Gingery v. City of Glendale*, 831 F.3d 1222, 1229 (9th Cir. 2016)). This line of Ninth Circuit precedent interpreted the tentative dicta in footnote 11 of *Garamendi* as stating a new rule of field preemption that superseded *Zschernig*. *See Gingery*, 831 F.3d at 1229 (quoting *Movesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1074–75 (9th Cir. 2012) (en banc)); *Movesian*, 670 F.3d at 1073 (citing *Garamendi*, 530 U.S. at 419 n.11). But that is a misinterpretation. The footnote suggested only when "field preemption *might* be the appropriate doctrine" and when "it *might* make good sense to require a conflict," after mulling over the majority opinion in *Zschernig* and Justice Harlan's critiques of it. *Garamendi*, 539 U.S. at 419 n.11 (emphasis added). The Court then concluded that those "question[s] require[d] no answer here," *id.* at 419–20, because the challengers to California's law had demonstrated a "clear conflict," *id.* at 420.

But even if the district court's two-part test were the law, Jones Eagle's field-preemption claim would fail at step one. For Arkansas's laws obviously *do* concern an area of traditional state responsibility. As discussed above, the States have been the primary source of restrictions

on alien property ownership for the entire history of the Nation. That is why the Supreme Court has said, in rejecting claims of field preemption on that subject, "[r]ights . . . to property are determined by local law." *Clark*, 331 U.S. at 517. And all the challenged statutes do is regulate aliens' ownership of certain types of real (under Act 636) and personal (under Act 174) property. Under the district court's and Ninth Circuit's test, as suggested by *Garamendi* footnote 11, that is the end of the matter. Were footnote 11 the law, so long as "a State has acted within . . . its 'traditional competence,'" preemption would "require a conflict," even if the State has acted "in a way that affects foreign relations." *Garamendi*, 539 U.S. at 419 n.11 (quoting *Zschernig*, 389 U.S. at 459 (Harlan, J., concurring in the result)).[4]

---

[4] Of course, this illustrates why *Garamendi* footnote 11, which did not purport to overrule *Zschernig*, is not the law. In *Zschernig*, the Court conceded that "[t]he several States, of course, have traditionally regulated the descent and distribution of estates," as it had held in *Clark*, and found field preemption anyway. 389 U.S. at 440. But if Jones Eagle argues that *Garamendi* overruled, *sub silentio*, *Zschernig*'s narrow rule and replaced it with a broader field-preemption doctrine, it must take the bitter of that overruling with the sweet—the bitter being that under *Garamendi*'s suggested rule, there would never be foreign affairs field preemption of laws within States' traditional competence.

Accordingly, whether under *Zschernig* or the district court's test, Jones Eagle has no likelihood of success on its field-preemption claim, and this Court should reverse.

## IV. THE OTHER PRELIMINARY-INJUNCTION FACTORS ALSO WEIGH IN FAVOR OF DEFENDANTS.

In holding that Jones Eagle had shown irreparable harm, the district court found that the mere existence of an investigation into whether it might have violated Acts 636 and 174 caused irreparable harm to its "reputation and goodwill."  Add. 40; App. 101; R. Doc. 35, at 40.  That cannot be right.  The courts of appeals to consider the question have held that an unenforced subpoena is not even enough for Article III injury, so it cannot be the case that the reputational shadow cast by a request for documents amounts to irreparable harm.

If a plaintiff fails to prove irreparable harm, a district court should "proceed no further in analyzing" the other preliminary-injunction factors, *Ng v. Bd. of Regents of Univ. of Minn.*, 64 F.4th 992, 999 (8th Cir. 2023), as "an absence of a finding of irreparable injury is alone sufficient ground for [denying] the preliminary injunction," *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 n.9 (8th Cir. 1981) (en banc).  "[T]o demonstrate irreparable harm, a party must show that the harm is

certain and great and of such imminence that there is a clear and present need for equitable relief." *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013) (quoting *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996)).

In finding that the harm to Jones Eagle was "certain and great," *id.*, the district court concluded that the existence of the Attorney General's investigation of Jones Eagle alone—regardless of whether Acts 636 and 174 would ever be enforced against Jones Eagle or even whether the subpoena would be enforced—was already causing Jones Eagle "irreparable harm . . . in the form of damage to reputation and goodwill." Add. 40; App. 101; R. Doc. 35, at 40. But even assuming reputational injury from a pending investigation could ever suffice for irreparable harm, the showing of damage to reputation and goodwill here was minimal. The district court likened this case to *Rogers Group, Inc. v. City of Fayetteville*, 629 F.3d 784 (8th Cir. 2010), where this Court held an ordinance caused irreparable harm to a quarry operator's goodwill because the ordinance would "prevent the [q]uarry from expanding" and force it to turn away new customers. *Id.* at 790. And the district court cited *Medicine Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801 (8th Cir. 2003), where a

pharmacy's ceasing to do business as Medicine Shoppe "create[d] consumer confusion," "erode[d] consumer confidence in the Medicine Shoppe network of franchises," and could potentially "make customers wonder whether other Medicine Shoppe franchises will continue to operate," *id.* at 805.

Here by contrast, the district court cited only vague testimony that Acts 636 and 174 had harmed Jones Eagle's reputation from Jones Eagle's manager, Chen. Add. 12; App. 73; R. Doc. 35, at 12. It pointed to his declaration testimony that unless the Court enjoined enforcement of Acts 636 and 174, Jones Eagle would sustain "the loss of goodwill to an incalculable but substantial degree," App. 47 ¶ 26; R. Doc. 7-1, at 3 ¶ 26, and to his hearing testimony that the investigation of Jones Eagle was "all over the news" and "affects our potential clients." 12/04/2024 Tr. 81:8. The majority of that testimony concerned the hypothetical loss of goodwill in the event that Defendants ultimately *enforced* Acts 636 and 174 against Jones Eagle and forced its data center to shut down. *See* App. 47–48 ¶¶ 30–32; R. Doc. 7-1, at 3–4 ¶¶ 30–32 (claiming that if Acts 636 and 174 were enforced against Jones Eagle, it "could threaten to prevent" Jones Eagle from being able to service its customers, and "if [Jones

Eagle] is unable to service its customers," its customers would leave and new ones would not hire Jones Eagle). But Jones Eagle cannot rely on the risk of actual enforcement to show irreparable harm. As the Fifth Circuit reasoned in an identical context, "as underscored by [a state attorney general's] apparent need to gather considerable information before he can determine whether an enforcement action is warranted, the prospect of one is not sufficiently imminent or defined to justify an injunction." *Google*, 822 F.3d at 228.

The district court also—contrary to binding precedent—refused to recognize the harm to Arkansas's sovereign interests. It claimed that "Defendants will sustain no appreciable harm by entry of a preliminary injunction" given its view that Acts 636 and 174 were preempted. Add. 41; App. 102; R. Doc. 35, at 41. But the Supreme Court has held that "the inability to enforce [a State's] duly enacted plans clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018); *see Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 609 (8th Cir. 2020) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts,

C.J., in chambers))). That interest does not evaporate merely because a district court concludes a plaintiff has some likelihood of success. If it did, the balance-of-harms inquiry would largely be subsumed by the likelihood-of-success inquiry in any case where a plaintiff seeks to preliminarily enjoin a state law.

## V. At Minimum, This Court Should Vacate the District Court's Overbroad Injunction.

The district court enjoined Defendants "from enforcing any provision of Act 636 or 174." Add. 43; App. 104; R. Doc. 35, at 43. But Jones Eagle only challenged—and the district court only found likely preempted—one provision of Act 174, its restriction on foreign ownership of digital asset mining businesses in Section 3 of that Act. The balance of Act 174 imposes a permitting regime on digital asset mining without regard to foreign ownership. *See* Ark. Code Ann. §§ 23-119-101 *et seq*. The district court did not even cite the permitting provisions in its order, much less find them likely foreign affairs conflict- or field-preempted, and there is no basis on which it could have. So there was no basis for the district court to enjoin Defendants from enforcing those provisions. Moreover, those provisions are not enforced by the Attorney General or Secretary of Agriculture, but rather by the Oil and Gas Commission, *see*

Ark. Code Ann. § 23-119-105, so Defendants are not even proper parties under *Ex parte Young* to enjoin from enforcing those provisions.

The only hint of a rationale the district court gave for enjoining Defendants from enforcing the entirety of Act 174, rather than only the provision Jones Eagle challenged and the district court found likely preempted, was an unreasoned sentence declaring that given Act 174's "statutory scheme, severability is not appropriate." Add. 43; App. 104; R. Doc. 45, at 43. But under Arkansas law, all statutes are severable unless "specifically provided," Ark. Code Ann. §§ 1-2-117, 1-2-205, and even under a more contextual severability regime, it is all but impossible to see why a restriction on foreign ownership of digital asset mining businesses would be unseverable from a generic permitting regime for digital asset mining businesses. Accordingly, this Court should at a minimum vacate the district court's injunction as overbroad.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's order granting a preliminary injunction and its denial of Defendants' motion to dismiss this suit as unripe.

Respectfully submitted,

TIM GRIFFIN
  Arkansas Attorney General

AUTUMN HAMIT PATTERSON
  Arkansas Solicitor General

ASHER L. STEINBERG
  Senior Assistant Solicitor General

OFFICE OF THE ARKANSAS
  ATTORNEY GENERAL
323 Center St., Suite 200
Little Rock, AR 72201
(501) 682-1051
Asher.Steinberg@arkansasag.gov

*Attorneys for Appellants*

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,214 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I also certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5)–(6) because it has been prepared in 14-point Century Schoolbook, using Microsoft Word.

I further certify that this PDF file was scanned for viruses, and no viruses were found on the file.

/s/ *Asher Steinberg*
Asher Steinberg

# CERTIFICATE OF SERVICE

I certify that on May 15, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to any CM/ECF participants.

/s/ *Asher Steinberg*
Asher Steinberg