No. 25-1047

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

_____

JONES EAGLE, LLC f/k/a JONES DIGITAL, LLC,
*Plaintiff-Appellee,*
v.
WES WARD, *et al.*,
Defendants-Appellants.

_____

On Appeal from the United States District Court
for the Eastern District of Arkansas
No. 4:24-cv-990
(Hon. Kristine G. Baker)

_____

## BRIEF OF PLAINTIFF-APPELLEE

_____

Robert S. Chang
Shaleen Shanbhag
FRED T. KOREMATSU CENTER FOR
    LAW AND EQUALITY
UC IRVINE SCHOOL OF LAW
401 E. Peltason Dr.
Irvine, CA 92697
Telephone: (949) 824-3044
rchang@law.uci.edu
sshanbhag@law.uci.edu

Paul L. Hoffman
CIVIL RIGHTS LITIGATION CLINIC
UC IRVINE SCHOOL OF LAW
401 E. Peltason Drive, Suite 1000
Irvine, CA 92697-8000
Telephone: (310) 717-7373
hoffpaul@aol.com

Andrew King
Frederick H. Davis
Alexander T. Jones
KUTAK ROCK LLP
124 West Capitol Ave., Suite 2000
Little Rock, AR 72201-3740
Telephone: (501) 975-3000
Facsimile: (501) 975-3001
andrew.king@kutakrock.com
frederick.davis@kutakrock.com
alex.jones@kutakrock.com

*Counsel for Plaintiff-Appellee*

# I. SUMMARY OF THE CASE

This case is about a lawful business standing up for itself against government overreach. Jones Eagle, LLC's principal, Qimin "Jimmy" Chen, is a U.S. citizen who came to Arkansas to open a lawful business. Jones Eagle had to seek and win a federal preliminary injunction to begin business operations. Afterwards, Appellants retaliated against Jones Eagle.

Appellants have subjected Jones Eagle to a multi-year criminal investigation and hostile public relations campaign to "investigate" potential violation of Acts 636 and 174. Appellants sought to make an example of Jones Eagle to chill others from standing up against government overreach. But Jones Eagle stood up for itself once again, obtaining injunctive relief for a second time.

Jimmy Chen's declaration, the hearing testimony, and Jones Eagle's 45 trial exhibits show the ripeness and merit of Jones Eagle's claims. The district court correctly concluded Jones Eagle met all four of the preliminary injunction factors. The district court's preliminary injunction should be affirmed.

Jones Eagle requests 30 minutes of oral argument for each side.

ii

## II.  CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1, undersigned counsel certify that the Plaintiff-Appellee, Jones Eagle, LLC, f/k/a Jones Digital, LLC, does not have a parent corporation.

Appellate Case: 25-1047     Page: 3     Date Filed: 08/15/2025 Entry ID: 5548363

# III. TABLE OF CONTENTS

I. SUMMARY OF THE CASE ......................................................... ii

II. CORPORATE DISCLOSURE STATEMENT ............................... iii

III. TABLE OF CONTENTS .......................................................... iv

IV. TABLE OF AUTHORITIES ..................................................... vi

V. STATEMENT OF ISSUES ......................................................... 1

VI. STATEMENT OF THE CASE ...................................................... 2

VII. SUMMARY OF THE ARGUMENT .......................................... 6

    A. Constitutional text and structure foreclose Appellants' position ........ 6

    B. Acts 636 and 174 undermine federal foreign affairs powers .............. 7

    C. Jones Eagle established the likelihood of irreparable harm, and the balance of harms and public interest support the preliminary injunction ........ 8

VIII. ARGUMENT ...................................................................... 10

    A. Statement of the Standard of Review ................................. 10

    B. Jones Eagle's Claims Are Ripe ....................................... 11

    C. Jones Eagle Is Likely to Prevail on Its Preemption Claims .............. 16

        1. The History of Expanding Federal Regulation of Foreign Investment ........ 17

        2. Acts 636 and 174 Conflict with FIRRMA, ITAR, and OFAC ........ 21

            a. Acts 636 and 174 conflict with FIRRMA's regulatory approach and definition of foreign ownership ........ 22

            b. Acts 636 and 174 conflict with ITAR and OFAC ......... 24

            c. Acts 636 and 174 are obstacles to federal policy objectives ........ 27

            d. Appellants' conflict preemption analysis is invalid ...... 30

        3. Acts 636 and 174 Are Field Preempted ................................ 32

            a. Foreign affairs field preemption under Zschernig is good law ........ 35

iv

       b.     Acts 636 and 174 impermissibly attempt to establish state foreign policy and disturb foreign relations ............................................................... 37

       c.     Acts 636 and 174 are preempted under the Ninth Circuit's standard for foreign affairs field preemption .................................................. 40

       d.     Zschernig is not limited to judicial scrutiny of foreign governments ............................................. 42

    4.     Acts 636 and 174 Do Not Govern Areas of Traditional State Regulation ........................................................... 44

       a.     Arkansas has no tradition of regulating alien property rights ................................................... 44

       b.     Acts 636 and 174 are state attempts to make foreign policy ................................................... 46

D.    The District Court Did Not Abuse Its Discretion in Granting the Preliminary Injunction ................................................ 48

    1.     The District Court's Finding of Irreparable Harm Is Entitled to Substantial Deference ........................... 49

    2.     The District Court Properly Weighed the Balance of Harms and Public Interest ................................... 49

    3.     Jones Eagle's Constitutional Claims Are Alternative Grounds for Affirmance ........................................ 50

       a.     Acts 636 and 174 violate the Commerce Clause ........... 51

       b.     Acts 636 and 174 violate Jones Eagle's right to equal protection ............................................. 52

       c.     Acts 636 and 174 violate Jones Eagle's right to procedural due process .................................... 54

       d.     Acts 636 and 174 threaten takings without just compensation ............................................... 56

IX.    CONCLUSION ............................................................... 57

X.    CERTIFICATE OF COMPLIANCE ................................. 58

XI.    CERTIFICATE OF SERVICE ......................................... 59

Appellate Case: 25-1047    Page: 5    Date Filed: 08/15/2025 Entry ID: 5548363

# IV.  TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Alexis Bailly Vineyard, Inc. v. Harrington*,
  931 F.3d 774 (8th Cir. 2019) ............................................................13

*American Ins. Ass'n v. Garamendi*,
  539 U.S. 396 (2003)..............................................................*passim*

*Arizona v. United States*,
  567 U.S. 387 (2012).......................................................16, 22, 32

*Benisek v. Lamone*,
  585 U.S. 155 (2018).................................................................50

*Bio Gen LLC v. Sanders*,
  142 F.4th 591 (8th Cir. 2025) .......................................10, 48

*Blythe v. Hinckley*,
  180 U.S. 333 (1901)................................................................47

*Braidwood Management, Inc. v. E.E.O.C.*,
  70 F.4th 914 (5th Cir. 2023) .............................................15

*Cal. Div. of Lab. Standards Enf't v. Dillingham Const., N.A., Inc.*,
  519 U.S. 316 (1995)................................................................33

*Chamber of Com. of U.S. v. Whiting*,
  563 U.S. 582 (2011)................................................................25

*City of Kennett, Missouri v. E.P.A.*,
  887 F.3d 424 (8th Cir. 2018) .............................................10

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013)................................................................13

*Clark v. Allen*,
  331 U.S. 506 (1947)................................................................44

*Cleburne v. Cleburne Living Center, Inc.*,
  473 U.S. 432 (1985)................................................................53

Appellate Case: 25-1047     Page: 6     Date Filed: 08/15/2025 Entry ID: 5548363

*Comptroller of Treasury of Maryland v. Wynne*,
   575 U.S. 542 (2015) ............................................................42

*Conforti v. U.S.*,
   74 F.3d 838 (8th Cir. 1996) ...............................................14

*Craig v. Simon*,
   980 F.3d 614 (8th Cir. 2020) .............................................10

*Crosby v. Nat'l Foreign Trade Council*,
   530 U.S. 363 (2000)......................................................*passim*

*Doe v. Hodgson*,
   478 F.2d 537 (2d Cir. 1973) ...............................................42

*Fac. Senate of Fla. Int'l Univ. v. Winn*,
   616 F.3d 1206 (11th Cir. 2010) (per curiam) ....................43

*Fuld v. Palestine Liberation Organization*,
   145 S.Ct. 2090...............................................................29, 30

*Garner v. White*,
   726 F.2d 1274 (8th Cir. 1984) ...........................................55

*Geier v. Am. Honda Motor Co.*,
   529 U.S. 861 (2000).......................................................30, 31

*Google, Inc. v. Hood*,
   822 F.3d 212 (5th Cir. 2016) .............................................15

*Hauenstein v. Lynham*,
   100 U.S. 483 (1879)............................................................47

*Hicks v. Miranda*,
   422 U.S. 332 (1975)............................................................42

*Hines v. Davidowitz*,
   312 U.S. 52 (1941)...............................................16, 17, 35, 38

*Hunt v. Cromartie*,
   526 U.S. 541 (1999)............................................................54

vii

*Iowa League of Cities v. E.P.A.*,
711 F.3d 844 (8th Cir. 2013) ...............................................................12

*Jones Digital, LLC v. Arkansas County, et al.*,
E.D. Ark. Case No. 2:23-CV-220-LPR ...............................................3

*Jones v. Gale*,
470 F.3d 1261 (8th Cir. 2006) ...........................................................51

*Kyocera Document Sols. Am., Inc. v. Div. of Admin.*,
708 F. Supp. 3d 531 (D.N.J. 2023) ....................................................41

*Landgraf v. USI Film Products*,
511 U.S. 244 (1994) .............................................................................55

*Libertarian Party of Arkansas v. Thurston*,
962 F.3d 390 (8th Cir. 2020) ...............................................................10

*Mandel v. Bradley*,
432 U.S. 173 (1977) .............................................................................42

*Mayor & City Council of Baltimore v. BP P.L.C.*,
31 F.4th 178 (4th Cir. 2022) ........................................................37, 40

*Metropolitan Life Ins. Co. v. Ward*,
470 U.S. 869 (1985) ........................................................................2, 54

*Movsesian v. Victoria Versicherung AG*,
670 F.3d 1067 (9th Cir. 2012) (en banc) ......................................40, 41

*Murr v. Wisconsin*,
582 U.S. 383 (2017) .............................................................................56

*Mutual Pharmaceutical Co. v. Bartlett*,
570 U.S. 472 (2013) .............................................................................24

*National Pork Producers Council v. Ross*,
598 U.S. 356 (2023) .............................................................................51

*Nebraska Public Power Dist. v. MidAmerican Energy Co.*,
234 F.3d 1032 (8th Cir. 2000) ...........................................................11

Appellate Case: 25-1047     Page: 8     Date Filed: 08/15/2025 Entry ID: 5548363

*Odebrecht Const., Inc. v. Secretary, Florida Dept. of Transp.*,
    715 F.3d 1268 (11th Cir. 2013) ........................................................... 43

*Oneok, Inc. v. Learjet, Inc.*,
    575 U.S. 373 (2015) .......................................................................... 33

*Parada v. Anoka Cnty.*,
    54 F.4th 1016 (8th Cir. 2022) ...................................................... 53, 54

*Pharm. Rsrch. & Mfrs. of Am. v. McClain*,
    95 F.4th 1136 (8th Cir. 2024) ...................................................... 25, 34

*Piazza's Seafood World, LLC v. Odom*,
    448 F.3d 744 (5th Cir. 2006) ............................................................ 51

*PPW Royalty Trust by and through Petrie v. Barton*,
    841 F.3d 746 (8th Cir. 2016) ............................................................ 14

*Religious Sisters of Mercy v. Becerra*,
    55 F.4th 583 (8th Cir. 2022) ........................................................ 1, 11

*Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*,
    826 F.3d 1030 (8th Cir. 2016) .......................................................... 50

*Rogers Group., Inc. v. City of Fayetteville*,
    629 F.3d 784 (8th Cir. 2010) ........................................................ 1, 49

*Saleh v. Titan Corp.*,
    580 F.3d 1 (D.C. Cir. 2009) .............................................................. 48

*Sch. of the Ozarks, Inc. v. Biden*,
    41 F.4th 992 (8th Cir. 2022) ............................................................ 11

*Shames v. Nebraska*,
    323 F. Supp. 1321 (D. Neb. 1971), *aff'd* 408 U.S. 901 (1972) .......................... 42

*Shen v. Simpson*,
    687 F. Supp. 3d. 1219 (N.D. Fla. 2023) .............................................. 47

*Shen v. Simpson*,
    No. 23-12737 (11th Cir. Feb. 1, 2024) ...................................... 43, 44, 47

ix

*South Dakota Farm Bureau, Inc. v. Hazeltine*,
    340 F.3d 583 (8th Cir. 2003) ...................................................................51

*St. Louis Effort for AIDS v. Huff*,
    782 F.3d 1016 (8th Cir. 2015) .....................................................................8

*Steffel v. Thompson*,
    415 U.S. 452 (1974)............................................................................11, 15

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014)..............................................................................1, 11

*Telescope Media Group v. Lucero*,
    936 F.3d 740 (8th Cir. 2019) .....................................................................15

*Tennessee Wine and Spirits Retailers Assoc. v. Thomas*,
    588 U.S. 504 (2019)............................................................................2, 51

*Terrace v. Thompson*,
    263 U.S. 197 (1923)...................................................................................47

*The Bd. of Regents of State Colleges v. Roth*,
    408 U.S. 564 (1972)...................................................................................55

*Trojan Techs., Inc. v. Pennsylvania*,
    916 F.2d 903 (3d Cir. 1990) ......................................................................42

*Truax v. Raich*,
    239 U.S. 33 (1915).....................................................................................53

*Tumey v. Mycroft AI, Inc.*,
    27 F.4th 657 (8th Cir. 2022) ......................................................................49

*Turkiye Halk Bankasi A.S. v. United States*,
    598 U.S. 264 (2023)...................................................................................39

*United States v. Calandra*,
    414 U.S. 338 (1974)...................................................................................56

*United States v. Curtiss-Wright Export Corp.*,
    299 U.S. 304 (1936)............................................................................38, 39

Appellate Case: 25-1047    Page: 10    Date Filed: 08/15/2025 Entry ID: 5548363

*United States v. Pink*,
315 U.S. 203 (1942)................................................................16, 32

*United States v. Skrmetti*,
145 S.Ct. 1816................................................................53

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
592 F.3d 954 (9th Cir. 2010) ................................................41

*Warner Bros. Ent. v. X One X Prods.*,
644 F.3d 584 (8th Cir. 2011) ................................................50

*Williamson v. Mazda Motor of Am., Inc.*,
562 U.S. 323 (2011)................................................................30, 31

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)................................................................49

*Wyeth v. Levine*,
555 U.S. 555 (2009)................................................................48

*Zschernig v. Miller*,
389 U.S. 429 (1968)................................................................*passim*

**State Cases**

*Applegate v. Lum Jung Luke*,
173 Ark. 93, 291 S.W.978 (1927) ................................44, 45, 46, 54

*Bean v. Office of Child Support Enf't*,
340 Ark. 286 (2000)................................................................55

*Blundell v. City of West Helena*,
258 Ark. 123, 522 S.W.2d 661 (1975) ................................55, 56

*Cnty. Commissioners of Boulder Cnty. v. Suncor Energy USA, Inc.*,
2025 CO 21 (May 12, 2025)................................................41

**Federal Statutes**

22 U.S.C. §§ 2751, *et seq.*................................................20

22 U.S.C. § 2778................................................................20

Appellate Case: 25-1047     Page: 11     Date Filed: 08/15/2025 Entry ID: 5548363

50 U.S.C. § 4565 ..................................................................*passim*

Exon-Florio Amendment to the Defense Production Act, Pub. L. 100-418, 102 Amendment Stat. 1107 (1988)...............................................18

Foreign Investment and National Security Act of 2007. Pub. L. No. 110-49, 121 Stat. 246 (2007) ...............................................................18

132 Stat. 1636, § 1702(b)(1)-(3) ...............................................................34

**State Statutes**

Act of Feb. 13, 1943, No. 47 Ark. Acts 75 (repealed 1953)....................45

Ark. Code Ann. § 14-1-606 ...........................................................23, 26

Ark. Code Ann. § 14-1-606(d) .............................................................14

Ark. Code Ann. § 18-11-802 ...........................................................23, 55

Ark. Code Ann. § 18-11-804 ...........................................................24, 52

Ark. Code Ann. § 18-11-804(c)(2) .......................................................14

Ark. Code Ann. § 25-16-705 .................................................................14

Florida Statutes §§ 692.201-692.204 ....................................................47

**Rules**

8th Cir. R. 10(A)(a)..................................................................................5

Fed. R. App. P. 28(b) .............................................................................10

**Regulations**

22 C.F.R. §§ 120-130..............................................................................20

22 C.F.R. § 126.1 ........................................................................20, 23, 26

22 C.F.R. §§ 1201.1 *et seq.*..................................................................23

31 C.F.R. § 800.224 ...............................................................................23

31 C.F.R. § 802, App'x A .......................................................................18

Appellate Case: 25-1047   Page: 12   Date Filed: 08/15/2025 Entry ID: 5548363

31 C.F.R. § 802.701 .................................................................20

31 C.F.R. § 802.901(a)-(c), (g) .............................................20

89 Fed. Reg. 18796 (March 15, 2024) ..................................20

89 Fed. Reg. 79141 (Sept. 27, 2024) ...............................20, 21

89 Fed. Reg. 88128-136 (Nov. 7, 2024) ...............................18

Exec. Order No. 11,858, 40 Fed. Reg. 20263 (May 7, 1975).....................17, 18, 34

Exec. Order No. 13637, 78 Fed. Reg. 11739 (Feb. 13, 2013) ................................20

Exec. Order No. 14083, 87 Fed. Reg. 57369 (Sept. 20, 2022) ................................19

## Constitutional Provisions

Ark. Const. art. 2, § 20................................................................45, 54

U.S. Const. amend. X ..................................................................7

U.S. Const. art. I, cl. 2 ...............................................................16

U.S. Const. art. I, § 1, cl. 1 .........................................................7

U.S. Const. art. I, § 8, cls. 1, 3, 4, 10-16, 18................................7

U.S. Const. art. I, § 9, cls. 5-6 .....................................................7

U.S. Const., art. I, § 10 ...............................................................7

U.S. Const. art. II, § 1, cl. 1 ........................................................7

U.S. Const. art II, § 2, cls. 1-2 .....................................................7

U.S. Const. art. III, §§ 1-2 ...........................................................7

U.S. Const. art. VI, § 2 ................................................................7

## Other Authorities

*Ban On Land Purchase By Japs Held Void*, Arkansas Democrat, May 4, 1943.................................................................45

Appellate Case: 25-1047     Page: 13     Date Filed: 08/15/2025 Entry ID: 5548363

The Federalist No. 3 (John Jay) ...................................................................6

The Federalist No. 42 (James Madison) ......................................................6

The Federalist No. 44 (James Madison) ...............................................6, 34

Francis E. Warren Air Force Base,
  https://home.treasury.gov/news/press-releases/jy2335 ......................19

Memorandum of Understanding, U.S. Dep't of Agriculture and U.S.
  Dep't of the Treasury,
  https://www.usda.gov/sites/default/files/documents/memorandum-
  of-understanding-7.7.25.pdf .............................................................19

OFAC, *About OFAC*, https://ofac.treasury.gov/about-
  ofac#:~:text=OFAC%20itself%20was%20formally%20created,ass
  ets%20subject%20to%20U.S.%20jurisdiction...................................21

OFAC, *Basic Information on OFAC and Sanctions*,
  https://ofac.treasury.gov/faqs/topic/1501 .......................................21

Treasury, *CFIUS Frequently Asked Questions*,
  https://home.treasury.gov/policy-issues/international/the-
  committee-on-foreign-investment-in-the-united-states-cfius/cfius-
  frequently-asked-questions ...............................................................19

Treasury, *CFIUS Overview*, https://home.treasury.gov/policy-
  issues/international/the-committee-on-foreign-investment-in-the-
  united-states-cfius/cfius-overview....................................................18

Appellate Case: 25-1047    Page: 14    Date Filed: 08/15/2025 Entry ID: 5548363

# V. STATEMENT OF ISSUES

Whether the district court erred in finding Jones Eagle is likely to prevail on the merits.

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000); *American Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003); *Zschernig v. Miller*, 389 U.S. 429 (1968).

Whether the district court erred in finding Jones Eagle's claims are ripe.

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014); *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583 (8th Cir. 2022).

Whether the district court erred in finding Jones Eagle would likely suffer irreparable harm and the balance of harms and public interest favored preliminary injunctive relief.

*Rogers Group., Inc. v. City of Fayetteville*, 629 F.3d 784 (8th Cir. 2010).

Appellate Case: 25-1047    Page: 15    Date Filed: 08/15/2025 Entry ID: 5548363

# VI. STATEMENT OF THE CASE

The Federal Government—not Arkansas—regulates foreign affairs, foreign relations, and national security. Acts 636 and 174 attempt to usurp and subvert the Federal Government's authority to regulate foreign investment. Constitutional text and structure undermine Appellants' position. So does binding precedent.

Acts 636 and 174 conflict and interfere with federal law. They intrude in the field of foreign affairs. Yet Appellants claim this Court should allow Arkansas to undertake unprecedented alienage discrimination in property ownership and business activities, which are foreclosed under Arkansas's *own* constitution.

This Court should affirm the district court's preliminary injunction. The district court properly found Jones Eagle is likely to prevail on the merits of its preemption claims. The district court properly found Jones Eagle faces irreparable harm without preliminary injunctive relief. The balance of harms and public interest support the preliminary injunction.

Intentional discrimination against out-of-state business is not a legitimate state purpose. *E.g.*, *Tennessee Wine and Spirits Retailers Assoc. v. Thomas*, 588 U.S. 504, 518 (2019) ("In light of this history and our established case law, we reiterate that the Commerce Clause by its own force restricts state protectionism."); *Metropolitan Life Ins. Co. v. Ward*, 470 U.S. 869, 880 (1985) ("[P]romotion of domestic business within a State, by discriminating against foreign corporations that wish to compete

2

by doing business there, is not a legitimate state purpose."). Yet Appellants *concede* Acts 636 and 174 were "motivated by concerns that [farmland and] crypto-mining facilities in the State were 'not Arkansas-owned or American-owned,' but rather 'foreign adversarially owned.'" Opp., 5. This admission suffices for affirmance.

Appellants' last line of defense is ripeness. Appellants now claim the district court moved too quickly. But below Appellants argued Jones Eagle "delay[ed] in filing" its lawsuit. App. 173; R. Doc. 24, at 1. Either way, Appellants' theory of heightened ripeness scrutiny is meritless.

Jones Eagle earlier won a preliminary injunction issued in *Jones Digital, LLC v. Arkansas County, et al.*, E.D. Ark. Case No. 2:23-CV-220-LPR. Appellants responded by retaliating against Jones Eagle. Secretary Ward circulated an *Arkansas Business* article on the preliminary injunction with the inquiry, "Do we have anything at all that can be used to demonstrate the ownership of this facility?" App. 333. Nine days later, Governor Sanders issued a press release that "alerted Attorney General Tim Griffin's office of two companies that may be in violation of Act 636," suggesting "Jones Digital LLC near the City of Dewitt, may have significant ties to China." App. 289[1]. That press release was entitled, "Sanders Administration Holds China Accountable." *Id*.

---

[1] Appendix page numbers 289-649 are exhibits entered into the record at the November 21 and December 4, 2024, hearings and are not electronically available on the district court docket.

The district court undertook 53 paragraphs of fact-finding over eleven pages surveying "the testimony and exhibits presented at the November 21, 2024, and December 4, 2024, hearings, as well as the other exhibits in the record." App. 63-74; R. Doc. 35, at 2–13. The district court found that "Jones Eagle has been publicly targeted by name and subjected to investigation by Defendants for almost a year." App. 101; R. Doc. 35, at 40.

Appellants elide over the district court's finding that "Jones Eagle sought information from Defendants about the reasonable suspicion or probable cause that would show a violation of Act 636 and specifically on what Defendants relied to state that Jones Eagle 'may have significant ties to China.'" App. 69; R. Doc. 35, at 8. Appellants ignore that Appellant Griffin "requested documentation from Jones Eagle to show that its parcel was less than 10 acres, as relevant to the statutory definition of 'agricultural land' under Act 636." *Id*. Appellants ignore that "Jones Eagle voluntarily provided that proof the next day." *Id*.

Appellants have orchestrated Act 636 investigations to target U.S. citizens *because* they were born in China. Appellant Ward testified he made an Act 636 referral because a person was "a U.S. citizen born in China." 12/04/2024 Tr. 14:9. Jimmy Chen testified he believes the true purpose of Appellants' Act 636 investigation is "because they think we are a company owned by Chinese nationality or Chinese government." *Id*. at 90:12-16.

4

Jones Eagle has shown the Act 636 investigation "affects its business activities." It risks losing customers "because of Acts 636, 174, and the Attorney General's activity." *Id.* at 89:14-23 to 90:11. On or about February 29, 2024, Appellant Griffin issued a subpoena to Sharp County Title Inc. intending to shut down a real estate transaction being undertaken by Jimmy Chen. App. 465–466. Jimmy Chen lost a business deal because the seller "got scared" by the subpoena. 12/04/2024 Tr. 88:17 to 89:13.

Appellants failed to "take steps to ensure that all trial exhibits and all relevant pretrial exhibits" were submitted with the record on appeal. 8th Cir. R. 10(A)(a). Accordingly, Jones Eagle supplements the appendix to ensure its trial exhibits and record evidence are before this Court.

Appellate Case: 25-1047   Page: 19   Date Filed: 08/15/2025 Entry ID: 5548363

# VII. SUMMARY OF THE ARGUMENT

## A. Constitutional text and structure foreclose Appellants' position.

At the Founding, state interference in foreign affairs posed a serious problem. "It is of high importance to the peace of America that she observe the laws of nations towards all these powers, and to me it appears evident that this will be more perfectly and punctually done by one national government than […] by thirteen separate States…." The Federalist No. 3 (John Jay). "If we are to be one nation in any respect, it clearly ought to be in respect to other nations." The Federalist No. 42 (James Madison).

Ensuring the Constitution guaranteed federal supremacy over foreign affairs was crucial. Madison emphasized the importance of Constitutional prohibitions against state-by-state "treaties, alliances, and confederations" as "fully justified by the advantage of uniformity in all points which relate to foreign powers; and of immediate responsibility to the nation in all those for whose conduct the nation itself is to be responsible." The Federalist No. 44 (James Madison). Absent clear federal supremacy over foreign affairs, Madison feared "[the world] would have seen the authority of the whole society every where subordinate to the authority of the parts; it would have seen a monster, in which the head was under the direction of the members." *Id.*

6

Accordingly, myriad constitutional provisions ensured the Federal Government—not the many states—would control foreign affairs.[2] Pursuant to the Supremacy Clause, foreign affairs preemption ensures states do not displace or interfere with federal authority to conduct foreign affairs.

**B.      Acts 636 and 174 undermine federal foreign affairs powers.**

Over the past half-century, Congress and the President have developed a robust federal system to regulate foreign investment in the United States. Through the Foreign Investment Risk Review and Modernization Act ("FIRRMA"), the Committee on Foreign Investment in the United States ("CFIUS"), the International Traffic in Arms Regulations ("ITAR"), and the Office of Foreign Assets Control ("OFAC"), Congress and the President have crafted a "plenitude of Executive authority," which Arkansas cannot trammel. *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 375–76 (2000) (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., *concurring*)).

As with the state-level sanctions regime pursued by Massachusetts in *Crosby*, Acts 636 and 174 threaten the federal government's ability to enforce its own statutes and regulations. If Acts 636 and 174 are enforceable, then Congress and the President will have fewer and less valuable bargaining chips to employ when

---

[2] U.S. Const. art. I, § 1, cl. 1; § 8, cls. 1, 3, 4, 10-16, 18; § 9, cls. 5-6; § 10; art. II, § 1, cl. 1; § 2, cls. 1-2; art. III, §§ 1-2; art. VI, § 2; amend. X.

7

deciding how to undertake foreign policy. Acts 636 and 174 cannot stand since they impose obstacles that conflict and interfere with the accomplishment and execution of the full purposes and objectives of federal law.

Appellants suggest only "miniscule pockets of foreign investment" would be affected by Acts 636 and 174. Opp., 17. This is a concession that Acts 636 and 174 *do* overlap and conflict with the CFIUS review process and the implementation of FIRRMA, OFAC, and ITAR. That concession suffices for affirmance.

Even if Appellants could show that Acts 636 and 174 fall within Arkansas's "historic police powers"—which they have failed to do—*Zschernig v. Miller* forecloses their enforcement under foreign affairs field preemption. 389 U.S. 429, 441 (1968). Acts 636 and 174 target specific foreign countries for economic restrictions and conflict with express foreign policy of the federal government. Acts 636 and 174 threaten "more than 'some incidental or indirect effect in foreign countries.'" *Zschernig*, 389 U.S. at 434.

**C.    Jones Eagle established the likelihood of irreparable harm, and the balance of harms and public interest support the preliminary injunction.**

"The decision to grant or deny a preliminary injunction rests within the discretion of the district court and will not be disturbed on appeal absent a showing of abuse of discretion." *St. Louis Effort for AIDS v. Huff*, 782 F.3d 1016, 1021 (8th Cir. 2015). The district court engaged in thorough fact-finding to conclude Jones Eagle would likely sustain irreparable harm in the absence of preliminary injunctive

8

relief. Arkansas has no tradition of regulating property ownership or business operations as attempted via Acts 636 and 174. Arkansas's *own* constitution renders the state's interest at its lowest possible ebb.

Ripeness is not an exacting inquiry. Jones Eagle has been subjected to a multi-year criminal investigation and hostile government-run public relations campaign in retaliation for having sought—and won—preliminary injunctive relief against earlier discriminatory treatment. This is overwhelming evidence of ripeness.

Appellants claim "the district court's injunction should be vacated as overbroad." Opp., 20. This argument was not made below and has not been preserved for appeal. In any case, the district court's preliminary injunction applies only to Jones Eagle, not other persons, negating Appellants' contention of overbreadth.

Unrebutted testimony shows Appellants have engaged in a concerted effort to target Jones Eagle and others based on their perceived national origin, which is subject to strict scrutiny review. Given Appellants' concession that the laws were not motivated by legitimate interests, both the public interest and balance of harms favor Jones Eagle. This Court should affirm the district court's preliminary injunction order in all respects.

9

## VIII. ARGUMENT

### A. Statement of the Standard of Review.

Jones Eagle supplements and corrects Appellants' standard of review. *See* Fed. R. App. P. 28(b). Appellants omit the standard of review for ripeness, which is reviewed de novo. *City of Kennett, Missouri v. E.P.A.*, 887 F.3d 424, 430 (8th Cir. 2018). Appellants also fail to acknowledge that "review of a preliminary injunction is layered." *Bio Gen LLC v. Sanders*, 142 F.4th 591, 600 (8th Cir. 2025). This Court thus "review[s] the district court's factual findings for clear error, its legal conclusions *de novo*, and the ultimate decision to grant the injunction for abuse of discretion." *Craig v. Simon*, 980 F.3d 614, 617 (8th Cir. 2020).

Finally, Appellants wrongly state that Jones Eagle was required to make a "'more rigorous showing' *than usual*" of likelihood of success on the merits. Opp., 21 (emphasis added). The problem lies with the Appellants' addition of the words—"than usual"—which are not present in the cited cases. The cited cases do not upset the well-established and usual standard that a party seeking to enjoin enforcement of a state statute must show it is "likely to prevail on the merits." *Libertarian Party of Arkansas v. Thurston*, 962 F.3d 390, 399 (8th Cir. 2020).

**B.     Jones Eagle's Claims Are Ripe.**

Jones Eagle need not "first expose [it]self to actual arrest or prosecution to be entitled to challenge a statute that [it] claims deters the exercise of [it]s constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). Jones Eagle's "challenge is to those specific provisions of state law which have provided the basis for threats of criminal prosecution against" it. *Steffel*, at 460. "Nothing in this Court's decisions requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 163 (2014).

"Ripeness is a 'closely related doctrine' of standing that 'originates from the same Article III limitation.'" *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 608 (8th Cir. 2022) (quoting *Sch. of the Ozarks, Inc. v. Biden*, 41 F.4th 992, 997 (8th Cir. 2022) (citing *Driehaus*, 573 U.S. at 157–58). "The ripeness doctrine prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements about administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Sch. of the Ozarks*, 41 F.4th at 997–98 (quotation omitted).

Ripeness is not an exacting inquiry. Jones Eagle must establish both prongs of ripeness to "a minimal degree." *Nebraska Public Power Dist. v. MidAmerican*

*Energy Co.*, 234 F.3d 1032, 1039 (8th Cir. 2000). If the issues "are not wading into the abstract" and the "disagreements before [the Court] are quite concrete," then a party has shown "fitness" to establish ripeness. *Iowa League of Cities v. E.P.A.*, 711 F.3d 844, 867 (8th Cir. 2013). The "hardship to parties" standard is met so long as "the threatened harm" is "immediate" and "not speculative." *Id.* at 868.

Jones Eagle has cleared this minimal hurdle. As the district court properly found, "it strains credulity to characterize this action as merely anticipating a future injury." App. 78; R. Doc. 35, at 17. The district court recited specific facts[3] establishing ripeness: Appellant Ward "publicly referred Jones Eagle to the Attorney General's Office for potential violation of Act 636, and Jones Eagle has been under public investigation by [] Attorney General Griffin ever since." *Id.* "[T]he Attorney General brought an action against Jones Eagle in Baxter County Circuit Court to enforce a subpoena issued as part of that investigation. *Id.* Moreover, "whether or not Jones Eagle is actually in violation of Act 636's terms, it has suffered real, concrete harm under the enforcement regime created by the statute." *Id.*

As the district court found, "Jones Eagle has shown that it faces a credible threat of prosecution, and the actions of [Appellants] sufficiently indicate that Jones Eagle's land at least arguably falls under the statute's terms—whether or not Jones

---

[3] Appellants have failed to assert that the district court clearly erred as to any finding of fact, thus waiving any such argument.

Eagle is correct in arguing that the statute should not apply to it." *Id.* The district court properly rejected Appellants' reliance on *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013). Jones Eagle has shown "a credible threat of prosecution" under the operative statutes to satisfy standing. *Alexis Bailly Vineyard, Inc. v. Harrington*, 931 F.3d 774, 778 (8th Cir. 2019).

Appellants incorrectly assert that Jones Eagle's ripeness "rest[s] only on the Attorney General's state-court action to enforce his investigative subpoena[,]" and that Jones Eagle's "only 'injury' is having to defend against the subpoena's enforcement." Opp., 28. That is incorrect.

Testimony from Appellant Ward and Jimmy Chen shows Appellants undertook investigation efforts based on national origin discrimination. Appellant Ward testified that U.S. Citizen investigative targets were chosen *because* they were born in China. App. 397 ("Its CEO is David Yu, a U.S. Citizen born in China."); 12/04/2024 Tr. 14:5-11 ("The last sentence of the page that you are referring to, the CEO, a U.S. citizen born in China. There were connections to China. There were questions about the ownership. And that's why we referred it to the attorney general's office."). Appellant Griffin's subpoena to a title company targeted Jimmy Chen for the purpose of shutting down his real estate transaction set to close the day the subpoena was served. App. 465–66.

13

Appellants' description of the state court subpoena action mischaracterizes that case and threatens prejudice to Jones Eagle. This Court should take judicial notice of that action since it is directly related to issues in this appeal. *See PPW Royalty Trust by and through Petrie v. Barton*, 841 F.3d 746, 753 (8th Cir. 2016); *Conforti v. U.S.*, 74 F.3d 838, 840 (8th Cir. 1996) ("We have held that federal courts may *sua sponte* take judicial notice of proceedings in other courts if they relate directly to the matters at issue.") (quotations omitted).[4]

Appellants incorrectly claim "Jones Eagle failed to respond" to that subpoena, Opp., 6, ignoring the district court's finding that "Jones Eagle sought to meet and confer with defendant Attorney General Griffin about the scope of the investigation, but defendant Attorney General Griffin refused." App. 69-70; R. Doc. 35, at 8–9. Appellants claim without citation that Jones Eagle "sued to enjoin the Attorney General from prosecuting [the subpoena enforcement action]." Opp., 23. Jones Eagle did not sue to enjoin the Attorney General from prosecuting the subpoena action.

To the contrary, it is *Appellant Griffin* who unilaterally moved to stay that action. With its January 8, 2025, filing, Jones Eagle *resisted* the motion for stay requested by Appellant Griffin. Jones Eagle argued, "a stay would prejudice Jones

---

[4] Though related, resolving this case will not affect the outcome of the state court subpoena action. That subpoena was issued under Ark. Code Ann. § 25-16-705, not Act 636 (Ark. Code Ann. § 18-11-804(c)(2)) or Act 174 (Ark. Code Ann. § 14-1-606(d)). Jones Eagle does not challenge Ark. Code Ann. § 25-16-705.

Appellate Case: 25-1047    Page: 28    Date Filed: 08/15/2025 Entry ID: 5548363

Eagle" and that Appellant Griffin "cannot show hardship or inequity in the absence of the stay." Jones Eagle noted it had "produced the relevant documents sought by [Appellants] over a month ago under an agreed protective order in the federal case." Jones Eagle made that production pursuant to Appellants' hearing subpoena. App. 468–74. Appellants introduced portions of Jones Eagle's production as sealed exhibits at the preliminary injunction hearing. *See* 12/04/2024 Tr. (sealed) 2.

Appellants rely on *Google, Inc. v. Hood*, 822 F.3d 212 (5th Cir. 2016). But *Hood* is off point because it was a challenge to the subpoena itself, not any substantive state law. Appellants fail to note the Fifth Circuit recently distinguished *Hood* in *Braidwood Management, Inc. v. E.E.O.C.*, 70 F.4th 914, 929 (5th Cir. 2023). *Braidwood* contrasted "the hazy application of the law in *Hood* with the concrete application in *Steffel*." *Id.* (citing 415 U.S. at 455). Rather than apply *Hood*, *Braidwood* cited this Court for the proposition that a "public[] announce[ment]" to enforce a statute and one prior proceeding are sufficient for standing." *Id.* (citing *Telescope Media Group v. Lucero*, 936 F.3d 740, 749-50 (8th Cir. 2019)).

Here, as in *Lucero*, Appellants publicly announced their investigation of Jones Eagle under Act 636. Appellants acknowledge their intent to proceed under Act 174. App. 79-80; R. Doc. 35, at 18-19. Appellants fail to address either *Steffel* or *Lucero*, which control. Under *Steffel* and *Lucero*, Jones Eagle has shown ripeness.

15

**C.    Jones Eagle Is Likely to Prevail on Its Preemption Claims.**

The district court correctly concluded that Jones Eagle is likely to prevail on the merits of its claims that Acts 636 and 174 are preempted by federal law. The district court articulated the "two fundamental constitutional issues underl[ying] the federal preemption issues presented in this case." App. 91; R. Doc. 35, at 30.

*First*, the district court cited the Supremacy Clause as the source for preemption, which provides that the Constitution and laws of the United States "shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. "Under this principle, Congress has the power to preempt state law." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (citing *Crosby*, 530 U.S. at 372).

*Second*, the district court identified the "array of constitutional provisions" vesting the federal government with "exclusive authority over foreign affairs." App. 92; R. Doc. 35, at 31; *see United States v. Pink*, 315 U.S. 203, 233 (1942) ("Power over external affairs is not shared by the States; it is vested in the national government exclusively."); *Hines v. Davidowitz*, 312 U.S. 52, 63 (1941) ("The Federal Government, representing as it does the collective interests of the forty-eight states, is entrusted with full and exclusive responsibility for the conduct of affairs with foreign sovereignties.... Our system of government … imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference."). The foreign affairs power may preempt state laws through

16

conflict or field preemption. *American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 418–20 (2003). Though either basis by itself would suffice, the district court found Jones Eagle is likely to succeed on the merits as to both conflict and field preemption. App. 95-100; R. Doc. 35, at 34–39.

### 1. The History of Expanding Federal Regulation of Foreign Investment.

In assessing whether state law "stands as an obstacle to the accomplishment and execution of the full objectives of Congress," *Hines*, 312 U.S. at 67, courts examine "the federal statute as a whole and identif[y] its purpose and intended effects," *Crosby*, 530 U.S. at 373. The legislative and executive branches have established a "comprehensive and complex federal regulatory regime," through FIRRMA, CFIUS, OFAC, and ITAR, to regulate and oversee foreign ownership of property, which preempts Arkansas's state-level attempt to regulate and oversee foreign ownership of property. App. 94; R. Doc. 35, at 33.

CFIUS is an interagency committee established by executive order in 1975. Exec. Order No. 11,858, 40 Fed. Reg. 20263 (May 7, 1975). In establishing CFIUS, President Ford emphasized: "International investment in the United States promotes economic growth, productivity, competitiveness, and job creation. It is the policy of the United States to support unequivocally such investment, consistent with the

17

protection of the national security." *Id*. The Secretary of the Treasury chairs CFIUS, with other CFIUS members from across numerous agencies and departments.[5]

Over the fifty years since CFIUS was established, Congress has steadily expanded its jurisdiction and responsibilities. *E.g.*, Exon-Florio Amendment to the Defense Production Act, Pub. L. 100-418, 102 Stat. 1107 (1988) (granting President authority to suspend or prohibit foreign acquisitions of U.S. companies); Foreign Investment and National Security Act of 2007. Pub. L. No. 110-49, 121 Stat. 246 (2007) (granting CFIUS formal statutory authority). In 2018, Congress passed FIRRMA, which broadened CFIUS jurisdiction to review certain real estate transactions and other foreign investments in U.S. businesses that deal in "critical technology," "critical infrastructure," or "sensitive personal data," based on potential national security risks. 50 U.S.C. § 4565.

FIRRMA expanded CFIUS jurisdiction to include real estate in proximity to government facilities and properties that are sensitive for national security reasons. 31 C.F.R. § 802, App'x A (listing 190 military installations); *see also* 89 Fed. Reg. 88128-136 (Nov. 7, 2024) (adding fifty-nine military installations). CFIUS

---

[5] U.S. Dep't of Treasury, *CFIUS Overview*, https://home.treasury.gov/policy-issues/international/the-committee-on-foreign-investment-in-the-united-states-cfius/cfius-overview.

18

maintains authority to review *any* transaction that could result in foreign control of any U.S. business, including digital asset mining facilities and agricultural land.[6]

Consistent with national policy, "[t]he CFIUS process, as modernized and strengthened by FIRRMA, enhances confidence in the nation's longstanding open investment policy by continuing to restrict only those foreign investments that pose national security concerns."[7] FIRRMA does not target any country for greater scrutiny. Rather, FIRRMA directs CFIUS to engage in a comprehensive, multi-phase risk-assessment analysis for each transaction to determine whether it poses national security risks. *See* 50 U.S.C. § 4565(f) (listing ten national security factors CFIUS may consider); Exec. Order No. 14083, 87 Fed. Reg. 57369 (Sept. 20, 2022) (adding five factors).

---

[6] *E.g.*, Statement on the President's Decision Prohibiting the Acquisition by MineOne Cloud Computing Investment I L.P. of Real Estate, and the Operation of a Cryptocurrency Mining Facility, in Close Proximity to Francis E. Warren Air Force Base, https://home.treasury.gov/news/press-releases/jy2335 (prohibiting purchase and requiring divestment of real estate operated as a digital asset mining facility that was majority-owned by nationals of the People's Republic of China after CFIUS review); Memorandum of Understanding, U.S. Dep't of Agriculture and U.S. Dep't of the Treasury, https://www.usda.gov/sites/default/files/documents/memorandum-of-understanding-7.7.25.pdf (CFIUS review of "agricultural land, agricultural biotechnology, or the agricultural industry").

[7] U.S. Dep't of the Treasury, *CFIUS Frequently Asked Questions*, https://home.treasury.gov/policy-issues/international/the-committee-on-foreign-investment-in-the-united-states-cfius/cfius-frequently-asked-questions.

CFIUS negotiates and implements mitigation agreements with transaction parties to reduce national security risks while allowing foreign investment to proceed. 50 U.S.C. § 4565(l)(3)(A). Under FIRRMA, the President retains the final decision whether to block any specific transaction. 50 U.S.C. § 4565(d)(4); 31 C.F.R. § 802.701. Criminal liability attaches only if a person makes a false statement to CFIUS. 31 C.F.R. § 802.901(a)-(c), (g).

ITAR are State Department regulations controlling the export and import of defense-related articles and services. 22 C.F.R. §§ 120-130.[8] ITAR lists certain countries, subject to modification, to which defense articles and services cannot be exported. These prohibitions align with U.S. foreign policy and security objectives. 22 C.F.R. § 126.1. ITAR is designed to allow the federal government to protect national security and foreign policy interests while responding to the ever-changing dynamics of international politics. For example, in March 2024, the State Department amended ITAR to add Nicaragua to a list of countries banned from U.S. defense imports and exports. 89 Fed. Reg. 18796 (March 15, 2024). Later that year, the State Department suspended for one year its designation of Cyprus as a proscribed destination. 89 Fed. Reg. 79141 (Sept. 27, 2024).

---

[8] ITAR is authorized by the Arms Export Control Act, 22 U.S.C. §§ 2751, *et seq.*, which empowers the President to control the import and export of defense articles and services. 22 U.S.C. § 2778. Executive Order 13637 delegates this authority to the Secretary of State. 78 Fed. Reg. 11739 (Feb. 19, 2013).

Appellate Case: 25-1047     Page: 34     Date Filed: 08/15/2025 Entry ID: 5548363

OFAC operates within the Treasury Department and administers the U.S.'s economic sanctions program against countries and individuals.[9] Pursuant to its enforcement authority, OFAC maintains a public Specially Designated Nationals and Blocked Persons List, which lists individuals and companies whose transactions are subject to sanctions. *Id.* While OFAC sanctions programs vary depending on foreign policy and national security goals, OFAC may block individual or country property interests and prevent U.S. citizens from transacting with sanctioned parties.[10] OFAC also offers licenses that grant exceptions for certain transactions that would otherwise be prohibited under the sanctions regime. *Id.*

Taken together, the federal regulatory regime of FIRRMA, ITAR, and OFAC occupy the fields of regulating foreign investment, national security, and transactions and exchanges of defense articles.

### 2. *Acts 636 and 174 Conflict with FIRRMA, ITAR, and OFAC.*

Conflict preemption requires a "sufficiently clear conflict" between the state law and foreign policy. *Garamendi*, 539 U.S. at 420–24. Under conflict preemption, federal law preempts state law when "compliance with both federal and state regulations is a physical impossibility" or when state law "stands as an obstacle to

---

[9] OFAC, *About OFAC*, https://ofac.treasury.gov/about-ofac#:~:text=OFAC%20itself%20was%20formally%20created,assets%20subject%20to%20U.S.%20jurisdiction.

[10] OFAC, *Basic Information on OFAC and Sanctions*, https://ofac.treasury.gov/faqs/topic/1501.

Appellate Case: 25-1047     Page: 35     Date Filed: 08/15/2025 Entry ID: 5548363

the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399. The district court properly found conflict preemption in this case. App. 98; R. Doc. 35, at 37 (noting "rather straightforward conflicts between federal policy and Acts 636 and 174").

        a.     *Acts 636 and 174 conflict with FIRRMA's regulatory approach and definition of foreign ownership.*

The district court appropriately recognized the obvious conflicts between Acts 636 and 174 and FIRRMA's "regulatory approaches" and definitions of "foreign ownership." App. 95; R. Doc. 35, at 34. Acts 636 and 174 criminalize ownership of agricultural land and digital asset mining businesses by "prohibited foreign parties." Unlike CFIUS, they implement no review process and make no attempt to mitigate security concerns. Accordingly, the district court held that Acts 636 and 174 "infringe upon Congress's carefully considered calibration" and "deprive the President of the discretion to approve or deny specific foreign investments based on the criteria that Congress judged to be relevant in making such determination—the very discretion which lies at the heart of CFIUS regime." App. 95; R. Doc. 35, at 34. The district court properly concluded, "Arkansas's blanket ban on certain categories of foreign ownership in Acts 636 and 174 thus clearly conflicts with the cautious, transaction-specific approach to foreign investment in FIRRMA." *Id.*; *see Arizona*, 567 U.S. at 406 ("A '[c]onflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy.'").

Further, the district court correctly found, "Acts 636 and 174 also conflict with FIRRMA's regime in terms of how they define foreign ownership." App. 95; R. Doc. 35, at 34. A "prohibited foreign party" under Act 174 includes citizens, residents, foreign governments, or parties of a country "subject to § 126.1 of the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. §§ 1201.1 *et seq*., as existing on January 1, 2024." Ark. Code Ann. § 14-1-606(a)(2). Act 636 also ties its definition of "prohibited foreign party" to people and entities from ITAR countries, though Act 636's definition is not frozen in time. Ark. Code Ann. § 18-11-802. Whereas Acts 636 and 174 impose blanket criminalizations on foreign ownership and investment in agricultural land and digital asset mining businesses, FIRRMA subjects to review only certain transactions by "foreign persons," defined as "foreign national, foreign government, or foreign entity," or an "entity over which control is exercised or exercisable by a foreign national, foreign government, or foreign entity." 31 C.F.R. § 800.224.

These state laws will inevitably conflict with federal law when an investment is cleared by CFIUS's risk-assessment process but is categorically prohibited and criminally sanctioned under Act 636 or Act 174. Indeed, the district court noted: "This could happen, for instance, if the President were to approve after CFIUS review the purchase of Arkansas farmland (or a digital asset mining business) adjacent to a military facility by a 'prohibited foreign party' under Act 636 or Act

174." App. 96 n.5; R. Doc. 35, at 35 n.5. Worse, Act 636's criminal penalties threaten imprisonment or a $15,000 fine. Ark. Code Ann. § 18-11-804. Thus, an alien whose purchase of Arkansas farmland is cleared by CFIUS review could nevertheless be incarcerated or fined by the State of Arkansas for the very purchase that the federal government reviewed and cleared. While an alien could "comply" with both regimes by foregoing the transaction, that does not negate the fact that state law conflicts with federal law. *Cf. Mutual Pharmaceutical Co. v. Bartlett*, 570 U.S. 472, 487 (2013) ("Our pre-emption cases presume that an actor seeking to satisfy both his federal- and state-law obligations is not required to cease acting altogether in order to avoid liability.").

  b.  *Acts 636 and 174 conflict with ITAR and OFAC.*

Acts 636 and 174 are also preempted due to their conflict and interference with ITAR's regulatory scheme. They regulate property ownership by persons associated with ITAR-list countries. However, the Secretary of State created ITAR's list of countries pursuant to delegated congressional authority for the purpose of restricting arms exports. Acts 636 and 174 thus encroach on federal foreign policymaking by hijacking a list of countries meant solely to restrict arms sales. The district court did not misunderstand ITAR, as Appellants claim. Opp., 40. Rather, the district court correctly concluded that "Acts 636 and 174's attempt to expand the list of prohibitions against these countries conflicts with the determination of

24

Congress and the State Department as to the breadth and depth of restrictions to be placed upon them." App. 97; R. Doc. 35, at 36.

Appellants claim Arkansas may freely incorporate federal laws such as ITAR for its own purposes. Opp., 43. But Appellants fail to address the far-reaching foreign affairs and national security implications of Acts 636 and 174's use of ITAR. Citing no authority, Appellants claim that Congress, the President, and the Secretary of State would endorse state-by-state use of the ITAR list for any other purpose, including prohibiting property ownership. Opp., 41. This argument ignores the actual stated purposes of Congress, the President, and the Secretary of State, which are controlling in the preemption analysis.

Appellants ignore the difference between incorporating federal law with domestic effects versus federal laws that regulate foreign affairs, which are in the exclusive domain of the federal government. Thus, Appellants' cases are inapposite. *See Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582 (2011) (state implementation of federal work authorization program); *Pharm. Rsrch. & Mfrs. of Am. v. McClain*, 95 F.4th 1136 (8th Cir. 2024) (comparing federal and state pharmacy law). If Congress wanted to restrict transactions with certain countries beyond arms exports, it would say so through legislation or treaty. Appellants cannot manufacture or infer congressional intent where none exists.

The district court also correctly found "Act 636 and 174 do not even employ consistent definitions of 'prohibited foreign party,'" since the definition in Act 636 is pegged to 22 C.F.R. § 126.1, whereas Act 174's definition is pegged to 22 C.F.R. § 126.1 'as existing on January 1, 2024.'" App. 97; R. Doc. 35, at 36. This creates a tandem of conflict.

Act 174 textually interferes with federal foreign policy because it employs an obsolete version of the ITAR list. Ark. Code Ann. § 14-1-606(2) (referring to ITAR "as existing on January 1, 2024"). Act 174 ignores changes in federal foreign policy after January 1, 2024, such as Nicaragua's inclusion on the ITAR list and Cyprus' suspension from the list.

Conversely, Act 636's list of countries changes alongside the ITAR list. When the Secretary of State imposes arms export restrictions on a new country, that will automatically prohibit any citizen of that country who resides in Arkansas from owning real property in Arkansas and invite seizure of that property by the state government. So too for any citizen of Arkansas who resides in a newly ITAR-listed country but who owns farmland in Arkansas. Appellants show no evidence Congress intended to deprive U.S. citizens or residents of real property whenever the Secretary of State updates the ITAR list to modify arms export restrictions.

OFAC provides additional conflict with Acts 636 and 174. OFAC imposes certain assets and trade restrictions to accomplish foreign policy and national

Appellate Case: 25-1047    Page: 40    Date Filed: 08/15/2025 Entry ID: 5548363

security goals. But OFAC may also provide licenses to permit otherwise sanctioned transactions. Therefore, Acts 636 and 174 conflict with the federal sanctions scheme by banning transactions OFAC might otherwise approve.

Arkansas may neither increase nor decrease the severity of ITAR or OFAC sanctions by compelling supplemental punitive measures beyond those authorized and intended by federal officers. *Crosby*, 530 U.S. at 377 ("Quite simply, if the Massachusetts law is enforceable the President has less to offer and less economic and diplomatic leverage as a consequence."). By reducing the value of the "bargaining chips" created by the ITAR list, Acts 636 and 174 threaten the flexibility the federal government has crafted to conduct foreign affairs, foreign relations, and national security policy. *See id.* (citing *Dames & Moore v. Regan*, 453 U.S. 654, 673 (1981)). Thus, Acts 636 and 174 are conflict preempted.

> ### c. Acts 636 and 174 are obstacles to federal policy objectives.

Acts 636 and 174 interfere with the federal government's foreign affairs powers by imposing obstacles to federal foreign policy. *Crosby* held that conflict preemption exists where, "under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." 530 U.S. at 373 (quoting *Hines* 312

U.S. at 67).[11] This hinges on whether the state law undermines "the intended purpose and 'natural effect' of … [the] provisions of the federal Act," *Crosby*, 530 U.S. at 373. Courts examine the state law's actual impact on the application of the federal law. If state law *results* in undermining an intended effect of federal law, that state law is conflict preempted. *Id.*

In *Crosby*, the Court invalidated a Massachusetts statute that imposed economic sanctions on the government of Burma. 530 U.S. at 373. Citing the President's executive discretion to control economic sanctions against Burma as conferred by federal statute, the Supreme Court held the Massachusetts law imposed an "obstacle to the accomplishment of Congress's full objectives under the federal Act." *Id.* Though the state law and federal regime had the *same* policy objectives, the Court held the state law interfered with the President's "capacity" to "speak for the Nation with one voice in dealing with other governments." *Id.* at 381.

Similarly, in *Garamendi*, the Supreme Court held a California law was preempted even without conflict with any federal statute because it constrained the President's exercise of authority in foreign affairs. "The exercise of the federal executive authority means that state law must give way where, as here, there is evidence of clear conflict between the policies adopted by the two." 539 U.S. at 420.

---

[11] Contrary to Appellants' contentions, *Crosby*'s conflict preemption test is not a bright-line rule but a totality of circumstances analysis.

Appellate Case: 25-1047    Page: 42    Date Filed: 08/15/2025 Entry ID: 5548363

When considering the preemptive effect of federal law, any doubt must be resolved in favor of the federal government's foreign affairs powers "given the weakness of the State's interest[.]" *Id.* at 425.

Acts 636 and 174 disrupt the federal government's interbranch, multi-agency, and carefully-crafted balance between encouraging foreign investment and mitigating risks to national security. They stand as obstacles to Congress and the President's specific judgments about national security and foreign affairs. This clear conflict "means that state law must give way." *Garamendi*, 539 U.S. at 420. The coordination by Congress and the President through FIRRMA to codify CFIUS, expand its jurisdictional reach, and formalize its procedure shows the "plenitude of Executive authority" that controls issues of preemption. *Crosby*, 530 U.S. at 376. "It is simply implausible that Congress would have gone to such lengths to empower the President if it had been willing to compromise his effectiveness by deference to every provision of state statute or local ordinance that might, if enforced, blunt the consequences of discretionary Presidential action." *Id.*, at 375–76 (citing *Youngstown*, 343 U.S. at 635 (Jackson, J., concurring)).

Just last month, the Supreme Court reconfirmed the paramount supremacy of coordinate action between the Executive and Congress in the field of foreign affairs. The Supreme Court reiterated the "Federal Government's" foreign affairs power is "inherent." *Fuld v. Palestine Liberation Organization*, 145 S.Ct. 2090, 2106

29

(quoting *Garamendi*, 539 U.S. at n. 9; *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936)). "[W]hen the Executive and Congress have spoken with one voice in that sphere, their coordinate action is 'supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it.'" *Fuld*, 145 S.Ct. at 2107 (quoting *Youngstown*, 343 U.S. at 637 (Jackson, Jr., concurring)).

> d. *Appellants' conflict preemption analysis is invalid.*

Appellants' conflict preemption analysis disregards these well-settled principles. Relying on two products liability cases about the auto industry, *Geier v. Am. Honda Motor Co.*, 529 U.S. 861 (2000), and *Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323 (2011), Appellants announce the following rule: "to infer preemption from non-regulation courts must find that leaving that conduct unregulated 'was a *significant objective* of federal law.'" Opp., 31 (quoting *Williamson*, 562 U.S. at 330 (emphasis added)).

This is not the law. Setting aside the fact that neither case involves foreign affairs preemption, Appellants misquote[12] and take *Williamson*'s "significant objective" language out of context. The Supreme Court used that phrase while describing *Geier*'s holding but did not announce any rule. *Id.* at 332 (federal regulation permitting vehicle airbag installation preempted state tort claims that a

---

[12] That quote reads, "significant objective of federal regulation," not "federal law."

Appellate Case: 25-1047     Page: 44     Date Filed: 08/15/2025 Entry ID: 5548363

car was defective because it lacked an airbag) (citing *Geier*, 529 U.S. at 881). Neither *Geier* nor *Williamson* requires express preemption. Both focus on the actual effect of the state law on the respective federal law's application, as the district court did here.[13] *See* App. 94-100; R. Doc. 35, at 33–39.

Appellants manufacture a novel and incorrect test from *Crosby* to determine what qualifies as a "significant objective of federal law." Opp., 31. According to Appellants, to "decide whether non-regulation was an objective of federal law, rather than mere silence, courts ask two questions." *Id*. *"*First, [courts] ask whether Congress otherwise regulated the 'basic subject' it left partly unregulated." *Id.* (quoting *Crosby*, 530 U.S. at 380). "Second, … a court must find that the zone of non-regulation was affirmatively 'drawn . . . to allow what [it] permit[s].'" *Id.* at 32 (quoting *Crosby*, 530 U.S. at 380). This test is not found in *Crosby* nor in any case interpreting it.

*First*, *Crosby* used the "same basic subject" language Appellants repeatedly emphasize only once, in a string cite quoting *Hines*, which merely observed that the "basic subject" of the state and federal laws in that case was "identical." *Crosby*, 530 U.S. at 380 (quoting *Hines,* 312 U.S. at 37). It did not establish a rule.

---

[13] In *Geier*, the Supreme Court analyzed "the regulation's history, the agency's contemporaneous explanation, and its consistently held interpretive views[,] [which] indicated that the regulation sought to maintain manufacturer choice in order to further significant regulatory objectives. [In *Williamson*], these same considerations indicate[d] the contrary." 562 U.S. at 336.

31

*Second*, nothing in *Crosby* suggests a court is required to find a "zone of non-regulation" that is "affirmatively 'drawn … to allow what [it] permit[s]'" to find preemption. Opp., 32 (quoting *Crosby*, 530 U.S. at 380). Appellants selectively quote *Crosby*, whose full text reads: "Sanctions are drawn not only to bar what they prohibit but to allow what they permit, and the inconsistency of sanctions here undermines the congressional calibration of force." *Crosby*, 530 U.S. at 380 (emphasis added). The "drawn to allow what they permit" language refers to the nature of sanctions. It does not establish a general rule for divining Congressional intent.

### 3. Acts 636 and 174 Are Field Preempted.

Field preemption blocks state law attempts to regulate "conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona*, 567 U.S. at 399. Foreign affairs field preemption applies when a state law "disturb[s] foreign relations" or if a state attempts to "establish its own foreign policy." *Zschernig v. Miller*, 389 U.S. 429, 441 (1968). Allowing states to regulate foreign affairs would "sanction a dangerous invasion of Federal authority" and "disturb that equilibrium in our foreign relations which the political departments of our national government had diligently endeavored to establish." *Pink*, 315 U.S. at 233.

Appellate Case: 25-1047     Page: 46     Date Filed: 08/15/2025 Entry ID: 5548363

Applying these principles, the district court correctly found "Jones Eagle is likely to succeed on its field preemption claim under the foreign affairs doctrine with respect to both Acts 636 and 174." App. 100; R. Doc. 35, at 39. Appellants fault the district court for relying on "its analysis of Jones Eagle's conflict preemption claim" to conclude the foreign affairs power preempted Arkansas laws. Opp., 44 (citing App. 100; R. Doc. 35, at 39). However, the categories of preemption are not "rigidly distinct," and "field pre-emption may be understood as a species of conflict pre-emption." *Crosby*, 530 U.S. at 372 n.6 (quoting *English v. General Elec. Co.*, 496 U.S. 72, 79, n.5 (1990)). The district court clearly understood the interrelation between conflict and field preemption when it incorporated its detailed conflict preemption analysis into its field preemption analysis.

Still, Appellants claim "federal law's silence on the bulk of real-estate and commercial foreign investment shows … that Congress left the traditional field of regulating alien ownership of real estate and personal property to States." Opp., 29. Appellants suggest the absence of specific federal regulation of agricultural land and digital asset mining businesses indicates an affirmative decision that federal law should not regulate them and implies permission for states to regulate them without restraint. *Id.* at 30.[14]

---

[14] Appellants again cite no foreign affairs case. Opp., 30 (citing *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 768 (2019) (nuclear fuel life cycle); *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373 (2015) (natural gas prices); *Cal. Div. of Lab. Standards Enf't v.*

Appellate Case: 25-1047     Page: 47     Date Filed: 08/15/2025 Entry ID: 5548363

Appellants have this backwards. Appellants' theory would require Congress to foresee and identify with granularity every sub-area of foreign investment regulations which it does not intend to leave to the states. That proposition is contrary to the doctrine of implied preemption, which preempts state regulation even in the absence of explicit federal preemption. *See Crosby*, 530 U.S. at 372. It is at its weakest here in the foreign affairs domain, where federal authority is at its apex. Appellants' theory fails to address the Founders' fears of the monster whose "head was under the direction of the members." The Federalist No. 44 (James Madison).

In enacting FIRRMA and codifying CFIUS review, Congress reasserted that the longstanding "policy of the United States [is] to enthusiastically welcome and support foreign investment, consistent with the protection of national security." 132 Stat. 1636, § 1702(b)(1)-(3); *see* Exec. Order No. 11,858, 40 Fed. Reg. 20263 (May 7, 1975) ("It is the policy of the United States to support unequivocally such investment, consistent with the protection of the national security."). Congress struck a careful balance between encouraging foreign investment while empowering CFIUS to review "investments that pose the greatest potential risk to national security." *Id.* at § 1702(b)(4).

---

*Dillingham Const., N.A., Inc*., 519 U.S. 316 (1995) (ERISA); *Pharm. Rsrch. & Mfrs. of Am. v. McClain*, 95 F.4th 1136, 1143–45 (8th Cir. 2024) (federal drug program)).

Appellate Case: 25-1047     Page: 48     Date Filed: 08/15/2025 Entry ID: 5548363

Congress has not endorsed state-by-state regulation to restrict and criminalize the property rights of aliens from ITAR countries. Nothing in FIRRMA, OFAC, or ITAR indicates Congress desired or authorized state intrusion into foreign affairs, foreign relations, or national security. Rather, Congress sought to ensure the President had flexibility to weigh various factors before deciding whether to bar foreign investment. Thus, the district court correctly held "Congress has deliberately chosen not to subject the categories of foreign investment prohibited by Acts 636 and 174 to special scrutiny." App. 96; R. Doc. 35, at 35.

### a. *Foreign affairs field preemption under Zschernig is good law.*

The Supreme Court has invalidated state laws that trespass upon the federal government's exclusive domain over foreign affairs policy in the absence of any conflict. *E.g.*, *Hines v. Davidowitz*, 312 U.S. 52 (1941) (invalidating a Pennsylvania immigration law because the field was occupied exclusively by federal law); *Zschernig*, 389 U.S. at 432 (striking down an Oregon probate law in the absence of federal action because it was an "intrusion by the State into the field of foreign affairs which the Constitution entrusts to the President and the Congress").

In *Zschernig*, the Supreme Court invalidated an Oregon statute prohibiting a nonresident alien from inheriting real or personal property unless three requirements were met: (1) a reciprocal U.S. right to take property on the same terms; (2) a right to receive payment from the foreign estate; and (3) a reciprocal foreign right to

Appellate Case: 25-1047     Page: 49     Date Filed: 08/15/2025 Entry ID: 5548363

receive estate proceeds. *Id.* at 430–31. The Supreme Court acknowledged states "traditionally regulated the descent and distribution of estates. But those regulations must give way if they impair the effective exercise of the Nation's foreign policy." *Id.* at 440. The Court held the Oregon statute was preempted because it was "an intrusion by the State into the field of foreign affairs which the Constitution entrusts to the President and the Congress." *Id.* at 432.

The Oregon statute "illustrate[d] the dangers which are involved if each State, speaking through its probate courts, is permitted to establish its own foreign policy." *Id.* at 441. "'Experience has shown that international controversies of the gravest moment, sometimes even leading to war, may arise from real or imagined wrongs to another's subjects inflicted, or permitted, by a government.'" *Id.* (quoting *Hines*, 312 U.S. at 64). The Court ultimately determined the Oregon law "has a direct impact upon foreign relations and may well adversely affect the power of the central government to deal with those problems." *Id.*

Contrary to Appellants' suggestions, the Supreme Court has not limited *Zschernig*. *E.g.*, *Crosby*, 530 U.S. at 370-73. In *Garamendi*, the Supreme Court discussed *Zschernig* extensively and affirmed the principles underlying foreign affairs field preemption: "There is, of course, no question that at some point an exercise of state power that touches on foreign relations must yield to the National

36

Government's policy…." 539 U.S. at 413 (holding executive agreements preempted California statute seeking to resolve Holocaust-era insurance claims).

Though *Garamendi* ultimately struck down the California statute based on conflict preemption, it endorsed the "contrasting theories of field and conflict preemption evident in the *Zschernig* opinions" without expounding further. *Garamendi*, 539 U.S. at 419. Appellants selectively quote dicta to argue *Garamendi* "cast doubt" on *Zschernig*. Opp., 46. To the contrary, the omitted text supports *Zschernig* and the foreign affairs doctrine:

> If a State were simply to take a position on a matter of foreign policy with no serious claim to be addressing a traditional state responsibility, field preemption might be the appropriate doctrine, whether the National Government had acted and, if it had, without reference to the degree of any conflict, the principle having been established that the Constitution entrusts foreign policy exclusively to the National Government.

*Garamendi*, 539 U.S. at n.11.

*Crosby* and *Garamendi* confirm *Zschernig* remains independent authority for affirmance on preemption.

### b. *Acts 636 and 174 impermissibly attempt to establish state foreign policy and disturb foreign relations.*

*Zschernig* established that foreign affairs field preemption "applies 'when a state law or policy disturb[s] foreign relations or if a State attempts to establish its own foreign policy.'" *Mayor & City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178, 213 (4th Cir. 2022) (quoting *Zschernig*, 389 U.S. at 441). The district court

37

properly found *Zschernig*'s "reasoning . . . applies even more strongly in this case, where Acts 636 and 174 go so far as to target specific foreign countries for economic restrictions and conflict with the express foreign policy of the federal government as represented by the FIRRMA and ITAR regimes." App. 98-99; R. Doc. 35, at 37–38.

The United States has inherent power as sovereign to control and conduct relations with foreign nations. *See Curtiss-Wright*, 299 U.S. at 318. "One of the most important and delicate of all international relationships […] has to do with the protection of the just rights of a country's own nationals when those nationals are in another country." *Hines*, 312 U.S. at 64.

Through Acts 636 and 174, Arkansas seeks to "establish its own foreign policy." *Zschernig*, 389 U.S. at 441. Record evidence shows that Appellants expressly asserted that Acts 636 and 174 form part of an anti-China slate of legislation. App. 293–96. On March 14, 2023, sponsoring Senator Blake Johnson stated on the Senate floor that the countries targeted by Act 636 included "China, Iran, North Korea, Syria, Venezuela, Afghanistan, Haiti, Iraq, Lebanon, Libya, Russia, [and] Somalia." App. 293. Senator Johnson justified Act 636 because "[w]e have recently seen a balloon fly over our land and there was great conc--, you know concern over that." App. 293. As Senator Johnson stated, "[i]t's a defense issue […] for […] our nation and for Arkansas." *Id.* The referenced balloon was the Chinese

Appellate Case: 25-1047   Page: 52   Date Filed: 08/15/2025 Entry ID: 5548363

spy balloon dominating headlines in February 2023, and Senator Johnson did not want "Chinese" owning "our land." *Id.*

Discussing the foreign relations implications of Act 174, Senator Bryan King stated "to me, it's almost like, on this foreign ownership, it's like, ten months after Pearl Harbor, it's like, well, we may need to look into the Japanese navy." App. 295. Minutes later, Senator King reiterated, "Harrison[, Arkansas] was Pearl Harbored in the situation." *Id.* at 296. This evidence, combined with the statutes' incorporation of ITAR countries, shows Acts 636 and 174 seek to establish state-level foreign policy by targeting specific countries, undermining federal supremacy in that field.

Acts 636 and 174 will have "direct impact on foreign relations [that] may well adversely affect the power of the central government." *Zschernig*, 389 U.S. at 441. Permitting Arkansas to divest property rights and bar transactions would weaken the federal government's authority and ability to exercise discretion in regulating foreign investment. Acts 636 and 174 undermine the President's exercise of foreign affairs powers through ITAR, a key tool for national defense policy in the exercise of "the powers of external sovereignty." *Curtiss-Wright*, 299 U.S. at 316.

As Justice Kavanaugh recently noted (without deciding the point), even "state criminal proceedings involving foreign states or their instrumentalities might be preempted under principles of foreign affairs preemption[.]" *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 279 (2023). Here, both Acts 636 and 174

Appellate Case: 25-1047    Page: 53    Date Filed: 08/15/2025 Entry ID: 5548363

implicate foreign affairs, foreign relations, and national security interests, including by threatening to impose criminal sanctions based on foreign residency or citizenship. They threaten to chill investment and sour relations with certain foreign countries, even if federal policy is not or is no longer adversarial. Due to their direct and foreseeable disruption of the federal government's conduct of foreign relations, Acts 636 and 174 are field preempted under *Zschernig*.

> c.  *Acts 636 and 174 are preempted under the Ninth Circuit's standard for foreign affairs field preemption.*

In the absence of a clear standard for foreign affairs preemption, the Ninth Circuit derived the following rule from *Garamendi*: "[W]hen a state law (1) has no serious claim to be addressing a traditional state responsibility and (2) intrudes on the federal government's foreign affairs power, the Supremacy Clause prevents the state statute from taking effect." *Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1074 (9th Cir. 2012) (en banc) (California law granting state jurisdiction over insurance claims by Armenian Genocide victims was not an area of traditional state responsibility and violated federal government's exclusive role in foreign affairs).

The court below endorsed the *Movsesian* standard. App. 99-100; R. Doc. 35, at 38–39. So should this Court. The Ninth Circuit's approach has gained traction in other courts. *See, e.g.*, *Mayor & City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178, 214 (4th Cir. 2022) ("Our conclusion neatly aligns with our sister circuits' approach of applying the foreign-affairs doctrine to disputes only with direct impacts

40

on foreign relations."); *Cnty. Commissioners of Boulder Cnty. v. Suncor Energy USA, Inc.*, 2025 CO 21 (May 12, 2025) (adopting *Movsesian* test); *Kyocera Document Sols. Am., Inc. v. Div. of Admin.*, 708 F. Supp. 3d 531 (D.N.J. 2023) (same).

Under this standard, Acts 636 and 174 are preempted. First, though Acts 636 and 174 purport to regulate property, their real purpose is to discriminate against certain persons based on alienage. *See Garamendi,* 539 U.S. at 426 ("[T]here is no serious doubt that the state interest actually underlying HVIRA is concern for the several thousand Holocaust survivors said to be living in the State."); *Movsesian*, 670 F.3d at 1076 (rejecting purported state interest in light of legislative findings demonstrating real purpose was to provide Armenian genocide victims potential monetary relief)*; Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 964 (9th Cir. 2010) ("Though § 354.3 purports to regulate property…§ 354.3's real purpose is to provide relief to Holocaust victims and their heirs.").

The historical absence of similar state regulation shows Acts 636 and 174 have no serious claims to address a traditional state responsibility. Yet they intrude on the federal government's foreign affairs power by undermining FIRRMA, ITAR, and OFAC. Whether under the Ninth Circuit standard or *Zschernig*, Jones Eagle is likely to prevail on its claim for foreign affairs field preemption.

41

> d. *Zschernig is not limited to judicial scrutiny of foreign governments.*

Appellants criticize the district court's adoption of the Ninth Circuit's standard, advancing instead a 1971 District of Nebraska case that limited the foreign affairs doctrine to "statutes that in application invited judicial examination and criticism of foreign governments." Opp., 48 (citing *Shames v. Nebraska*, 323 F. Supp. 1321 (D. Neb. 1971), *aff'd* 408 U.S. 901 (1972)).

Appellants are mistaken that the Supreme Court's summary affirmance of *Shames* makes that district court opinion binding on this Court. "Because a summary affirmance is an affirmance of the judgment only, the rationale of the affirmance may not be gleaned solely from the opinion below." *Mandel v. Bradley*, 432 U.S. 173, 176 (1977). Such opinions have "considerably less precedential value than an opinion on the merits." *Comptroller of Treasury of Maryland v. Wynne*, 575 U.S. 542, 559-560 (2015) (quotations omitted). Appellants' authorities, *Hicks v. Miranda*, 422 U.S. 332 (1975) and *Doe v. Hodgson*, 478 F.2d 537 (2d Cir. 1973), addressed summary affirmances within the same litigation. Appellants cite no authority holding that a summary affirmance applies to a different case with different facts. In any event, *Shames*—and another case Appellants rely on, *Trojan Techs., Inc. v. Pennsylvania*, 916 F.2d 903 (3d Cir. 1990)—are each distinguishable because the respective Nebraska and Pennsylvania statutes treated all foreign regimes the same way, unlike Acts 636 and 174.

42

Appellants' reliance on *Fac. Senate of Fla. Int'l Univ. v. Winn*, 616 F.3d 1206, 1207 (11th Cir. 2010) (per curiam), is misplaced. Though the Eleventh Circuit did not disturb a Florida statute that restricted "the use of state money for travel by state employees to countries that the federal government has listed as 'State Sponsors of Terrorism,'" *Id.* at 1207, it later narrowed that holding in *Odebrecht Const., Inc. v. Secretary, Florida Dept. of Transp.*, 715 F.3d 1268, 1286 (11th Cir. 2013) (noting *Winn* involved Florida's substantial interest "in managing its own education spending" with limited conflict with federal policy).

*Odebrecht* concerned Florida's "Cuba Amendment" which imposed economic sanctions "on companies that do business [in Cuba] and even on companies that are only distantly affiliated with companies that do business [in Cuba]." *Id.*, at 1287. Applying *Crosby*, the Eleventh Circuit held "Odebrecht has demonstrated a substantial likelihood of success on its claim that the Cuba Amendment is preempted by federal law," since it "undermines the full purposes and objectives of the extensive and nuanced federal Cuban sanctions regime." *Id.* When entering the preliminary injunction on appeal in *Shen v. Simpson* in a challenge to Florida's alien land law, the Eleventh Circuit cited *Odebrecht* alongside

*Garamendi* and *Crosby*. *See Shen v. Simpson*, No. 23-12737, at 1 (11th Cir. Feb. 1, 2024).[15]

### 4. Acts 636 and 174 Do Not Govern Areas of Traditional State Regulation.

Appellants mistakenly claim Acts 636 and 174 are owed special deference because they fall under an area of traditional state regulation: alien property ownership. *See* Opp., 33–35 (discussing "centuries-long tradition" of state laws governing alien land ownership). Appellants offer not a single historical example of a successful Arkansas law regulating alien property ownership. At bottom, Acts 636 and 174 are not about alien property ownership. Rather, these laws are attempts to make foreign affairs and national security policy at the state level by prohibiting ownership of land by individuals associated with ITAR countries.

#### a. Arkansas has no tradition of regulating alien property rights.

Appellants fail to address *Applegate v. Lum Jung Luke*, which shows restricting alien property ownership has no "tradition" in Arkansas law. 173 Ark. 93, 291 S.W. 978 (1927). In *Applegate*, the Arkansas Supreme Court struck down as unconstitutional the Alien Land Act of 1925, which prevented some aliens from

---

[15] Appellants' citation to *Clark v. Allen*, 331 U.S. 506 (1947), is unavailing. *Zschernig* itself distinguished *Clark*: "Had [*Clark*] appeared in the posture of [*Zschernig*], a different result would have obtained. We were there concerned with the words of a statute on its face, not the manner of its application." *Zschernig*, 389 U.S. at 433.

44

owning or using land. *Id.* at 979. *Applegate* shows this kind of regulation has been invalid under Arkansas law for nearly a century.

Appellants also ignore Act 47 of 1943, an Arkansas wartime measure that facially discriminated based on race, national origin, and alienage. Act of Feb. 13, 1943, No. 47 Ark. Acts 75 (repealed 1953). Act 47 provided, "no Japanese or a decendant [sic] of a Japanese shall ever purchase or hold title to any lands" in Arkansas. *Id.* Mere weeks after its passage, Appellant Griffin's predecessor declared Act 47 void and unenforceable under *Applegate*. *Ban On Land Purchase By Japs Held Void*, Arkansas Democrat, May 4, 1943. The Arkansas General Assembly repealed Act 47 a decade later, as part of an omnibus repeal of "obsolete" laws, such as those fixing punishments for aiding runaway slaves and forbidding playing baseball or hunting on Sundays. *See* Act of Mar. 31, 1953, No. 554 Ark. Acts 1439.

Appellants fail to mention that such discrimination is prohibited by the Arkansas Constitution: "No distinction shall ever be made by law between resident aliens and citizens in regard to the possession, enjoyment or descent of property." Ark. Const., art. 2, § 20.

After the failures of 1925 and 1943, Arkansas waited 80 years before codifying alienage discrimination in property ownership in Act 636 of 2023 and Act 174 of 2024. Far from being the latest in "a centuries-long tradition" of regulating

Appellate Case: 25-1047     Page: 59     Date Filed: 08/15/2025 Entry ID: 5548363

alien land ownership, as shown by *Applegate* and the downfall of Act 47, Acts 636 and 174 are unprecedented, not "traditional."

>    b.    *Acts 636 and 174 are state attempts to make foreign policy.*

Acts 636 and 174 are attempts to make foreign policy at the state level. Appellants have cheered the foreign affairs and national security implications of Acts 636 and 147. Governor Sanders's press release announcing the Act 636 referral of Jones Eagle was entitled "Sanders Administration Holds China Accountable." App. 289. On December 21, 2023, Governor Sanders publicized a video stating, "Communist China is America's greatest threat. And I won't let them buy up and exploit Arkansas land. That's why I was the first governor in the country to kick a Chinese state-owned company off our farmland. And we received a check for $280,000 from that company for violating our laws. And my administration just recommended two other companies for investigation to the State Attorney General's Office. They're both linked to the CCP, and one operates crypto mines around the state. This isn't about where you're from. It's about where your loyalties lie. We simply can't trust those who pledge allegiance to a hostile foreign power." App. 245, R. Doc. 27, at n.8. There is no authority for the proposition that states have any role in regulating foreign investment, national security, or foreign affairs.

Appellants' reliance on archaic Supreme Court cases is misplaced. *See* Opp., 34–35. Two cases directly acknowledge federal supremacy over state restrictions on

alien property rights. *See Hauenstein v. Lynham*, 100 U.S. 483, 488 (1879) (recognizing supremacy of treaty between the U.S. and Switzerland over Virginia common law prohibiting alien land ownership); *Blythe v. Hinckley,* 180 U.S. 333, 340 (1901) (recognizing supremacy of treaty over "the law of a particular state" when in conflict). None provide that aliens from specified countries may be singled out by a state. *E.g.*, *Terrace v. Thompson*,  263 U.S. 197, 218 (1923) (upholding "[s]tate legislation applying alike and equally to all aliens").

Appellants cite a Florida district court opinion upholding a state statute akin to Act 636, *Shen v. Simpson,* 687 F. Supp. 3d. 1219 (N.D. Fla. 2023). But Appellants fail to disclose the Eleventh Circuit's subsequent ruling that the Florida statute was likely preempted by FIRRMA. *Shen v. Simpson*, No. 23-12737 (11th Cir. Feb. 1, 2024) ("In our view, the plaintiffs/appellants have shown a substantial likelihood of success on their claim that Florida Statutes §§ 692.201-692.204 are preempted by federal law[.]") (citing 50 U.S.C. § 4565 (FIRRMA); 31 C.F.R. § 802.701 (providing finality of approval determinations by CFIUS); *Garamendi*, 539 U.S. at 419-27; *Crosby*, 530 U.S. at 372-88; and *Odebrecht*, 715 F.3d at 1280-88).

Appellants claim that "Congress's failure to enact an express preemption clause strongly suggests it did not view that regulation as conflicting with CFIUS." Opp., 39. Yet *Crosby* rejected as "unconvincing" this precise argument from the State of Massachusetts, because "[a] failure to provide for preemption expressly may

47

reflect nothing more than the settled character of implied preemption doctrine that courts will dependably apply[.]" 530 U.S. at 387–88.

*Wyeth v. Levine* is a pharmaceutical case with no application to foreign affairs preemption. 555 U.S. 555 (2009). There, the Supreme Court analyzed the FDA's history to conclude common law tort lawsuits were not preempted because "the FDA long maintained that state law offers an additional, and important layer of consumer protection that complements FDA regulation." *Id.* at 579. As the D.C. Circuit noted in *Saleh v. Titan Corp.*, 580 F.3d 1, 10–11 (D.C. Cir. 2009), *Wyeth* is premised on a presumption against preemption in areas of traditional state regulation, such as "tort regulation of dangerous or mislabeled products." Unlike products liability law, foreign affairs, foreign relations, and national security are quintessential federal responsibilities.

The district court correctly found the express foreign policy of the federal government preempted Acts 636 and 174 even assuming they fell within the scope of Arkansas's historic police powers. App. 98-99; R. Doc. 35, at 37–38 (citing *Zschernig*, 389 U.S. at 435–40). The district court should be affirmed.

## D. The District Court Did Not Abuse Its Discretion in Granting the Preliminary Injunction.

This Court reviews the district court's preliminary injunction order under a layered abuse of discretion standard. *Bio Gen LLC*, 142 F.4th at 600. By that measure, this Court should affirm the district court. The district court undertook

48

rigorous factfinding that showed Jones Eagle would likely suffer irreparable harm in the absence of preliminary injunctive relief. The district court appropriately weighed the balance of harms and public interest. And Jones Eagle is likely to prevail on its constitutional claims, in addition to the grounds for federal preemption.

### 1. The District Court's Finding of Irreparable Harm Is Entitled to Substantial Deference.

Jones Eagle is "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The district court has broad discretion to make findings of irreparable harm, which are entitled to substantial deference. *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 665 (8th Cir. 2022). Loss of business goodwill can constitute irreparable harm. *Rogers Group, Inc. v. City of Fayetteville, Ark.*, 629 F.3d 784, 790 (8th Cir. 2010).

The district court correctly concluded that Jones Eagle faced "irreparable harm from the public investigation and threatened enforcement actions… in the form of damage to reputation and goodwill," and "risk[ed] imprisonment, fines, and judicial foreclosure." App. 101-102; R. Doc. 35, at 40–41. Appellants fail to show this finding was an abuse of discretion.

### 2. The District Court Properly Weighed the Balance of Harms and Public Interest.

The district court "has broad discretion when ruling on a request for preliminary injunction" to balance the four factors to achieve the most equitable

49

result. *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1035 (8th Cir. 2016) (quotation omitted). Appellants have not shown that the district court's weighing of the factors amounted to an abuse of discretion.

The public interest is served by preserving the status quo ante, and the preliminary injunction preserves "the relative positions of the parties." *Benisek v. Lamone*, 585 U.S. 155, 161 (2018) (quoting *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)). Arkansas has no history of regulating alien property rights, and its own constitution forecloses these efforts. Accordingly, Jones Eagle's likelihood of irreparable harm outweighs any minimal harm Appellants might sustain under the preliminary injunction.

### 3. Jones Eagle's Constitutional Claims Are Alternative Grounds for Affirmance.

The Eighth Circuit "may affirm the judgment of the district court on any basis disclosed in the record, whether or not the district court agreed with or even addressed that ground." *Warner Bros. Ent. v. X One X Prods.*, 644 F.3d 584, 591 (8th Cir. 2011) (citations omitted). While the district court declined to rule on Jones Eagle's claims under the Commerce, Equal Protection, Due Process, and Takings Clauses, it nonetheless acknowledged "on the limited record before it, Jones Eagle has the better of the argument with respect to all of its [remaining constitutional] claims." App. 100; R. Doc. 35, at 39. This Court can affirm the injunction based on the likelihood that Jones Eagle will prevail on its other claims.

50

a.    *Acts 636 and 174 violate the Commerce Clause.*

The Commerce Clause prohibits purposeful discrimination against out-of-state or foreign commerce in favor of in-state commerce. *National Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023). State laws driven by economic protectionism violate the "antidiscrimination principle that lies at the 'very core' of our dormant Commerce Clause jurisprudence." *Id.* at 369 (quoting *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 581 (1997)). For similar reasons, facial discrimination against foreign commerce is virtually per se invalid. *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 750 (5th Cir. 2006) (striking down Louisiana's Catfish Statute that prohibited labeling Vietnamese fish imports as "catfish").

This Court has struck down state laws discriminating against interstate commerce as "*per se* invalid," absent a showing "under rigorous scrutiny" that the state has no other means to advance a legitimate local interest. *E.g.*, *Jones v. Gale*, 470 F.3d 1261 (8th Cir. 2006) (striking down Nebraska constitutional amendment as violation of dormant Commerce Clause); *South Dakota Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583, 593 (8th Cir. 2003) (striking down South Dakota analogue). Protectionism is not a legitimate state interest. *Tennessee Wine and Spirits Retailers Assoc. v. Thomas*, 588 U.S. 504, 531 (2019) (state residency requirement to obtain retail alcohol license violated Commerce Clause).

Act 636 discriminates against aliens who reside outside Arkansas and favors aliens who reside within Arkansas. Ark. Code Ann. § 18-11-804(a). Act 636 exposes out-of-state businesses to felony criminal liability while offering affirmative defenses to their in-state competitors. Ark. Code Ann. § 18-11-804(f). Act 174's explicit bar to foreign participation in the Arkansas digital asset mining market discriminates *per se* against out-of-state commerce in favor of in-state commerce. Act 174 prohibits certain business activities by persons residing outside Arkansas, while permitting those very same activities by persons residing inside Arkansas. Both text and legislative history are plain: discriminating against interstate and foreign commerce was the purpose of Acts 636 and 174.

In the proceedings below, Appellants attempted to reframe the issue as one about taxation, which it is not. App. 202-203; R. Doc. 24, at 30-31. Appellants now *concede* Act 636 and 174 were "motivated by concerns that [farmland and] crypto-mining facilities in the State were 'not Arkansas-owned or American-owned,' but rather 'foreign adversarially owned." Opp., 5. Thus, the preliminary injunction should be affirmed because Acts 636 and 174 violate the Commerce Clause.

> b. *Acts 636 and 174 violate Jones Eagle's right to equal protection.*

The Equal Protection Clause protects Jones Eagle against laws motivated by discriminatory intent which result in discriminatory practices or disparate treatment due to race, alienage, or national origin. Strict scrutiny review applies to Acts 636

52

and 174's textually discriminatory classifications on the basis of alienage. *Truax v. Raich*, 239 U.S. 33 (1915) (striking down Arizona law that required employers to hire a quota of qualified voters or native-born citizens). "The discrimination is against aliens as such in competition with citizens in the described range of enterprises, and in our opinion it clearly falls under the condemnation of the fundamental law." *Id.* at 43; *see Parada v. Anoka Cnty.*, 54 F.4th 1016 (8th Cir. 2022) (classification based on alienage "subject to strict scrutiny").

Last month, the Supreme Court again noted alienage discrimination warrants strict scrutiny. *United States v. Skrmetti*, 145 S.Ct. 1816, 1828 ("[L]aws that classify on the basis of race, alienage, or national origin trigger strict scrutiny and will pass constitutional muster 'only if they are suitably tailored to serve a compelling state interest.'") (quoting *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 440 (1985)). "These factors are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy—a view that those in the burdened class are not as worthy or deserving as others." *Cleburne*, 473 U.S. at 440.

Acts 636 and 174 facially discriminate against aliens from ITAR-list countries and U.S. citizens residing in ITAR-list countries. Beyond the facial discrimination of their text, the history of Acts 636 and 174 reveal that both employ pretext to achieve purposeful discrimination on account of actual or perceived race, national

original, and ethnic identity. *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999) ("The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decision making body, minutes of its meetings, or reports.").

Acts 636 and 174 fail strict scrutiny. Arkansas has no compelling state interest to vindicate, and the means it has chosen to employ are not narrowly tailored. *Parada*, 54 F.4th at 1021. These laws fail even rational basis review because intentional discrimination against an out-of-state business is not a legitimate state purpose. *Metropolitan Life*, 470 U.S. at 880. The Arkansas Constitution provides that classifications regulating property rights based on race, alienage, or national origin are not a legitimate governmental interest. Ark. Const. art. 2, § 20 ("No distinction shall ever be made by law, between resident aliens and citizens, in regard to the possession, enjoyment or descent of property"); *Applegate*, 291 S.W. at 979 (striking down alien land law). Acts 636 and 174 cannot withstand rational basis scrutiny, let alone strict scrutiny.

<em>c.    Acts 636 and 174 violate Jones Eagle's right to procedural due process.</em>

The Due Process Clause protects the fundamental rights and liberty interests of all persons in the United States from unreasonable governmental interference through state action, including that which is arbitrary, irrational, oppressive, discriminatory, and egregious. Acts 636 and 174 violate Jones Eagle's procedural

Appellate Case: 25-1047     Page: 68     Date Filed: 08/15/2025 Entry ID: 5548363

due process rights in three ways. *The Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 571-72 (1972) ("[T]he property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money.").

*First*, Act 636 fails to clearly define "agricultural land" Ark. Code Ann. § 18-11-802(1)(A)(ii). "Vague laws offend due process because they violate the two essential values of fair warning and nondiscriminatory enforcement." *Garner v. White*, 726 F.2d 1274 (8th Cir. 1984).

*Second*, Acts 636 and 174 have no textual retroactive effect. Jones Eagle acquired its leasehold and began its digital asset mining business before Acts 636 and 174 became effective. Jones Eagle's pre-existing lawful use is a property interest entitled to constitutional protection. *Blundell v. City of West Helena*, 258 Ark. 123, 130, 522 S.W.2d 661 (1975). Appellants have not overcome the federal and state presumptions against retroactive legislation. *Landgraf v. USI Film Products*, 511 U.S. 244, 266 (1994) ("[T]he presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic."); *Bean v. Office of Child Support Enf't*, 340 Ark. 286, 296 (2000) ("Our rule on this point could not be more clear. Retroactivity is a matter of legislative intent. Unless it expressly states otherwise, we presume the legislature intends for its laws to apply only prospectively.").

55

*Third*, Acts 636 and 174 do not define "reasonable suspicion," "probable cause," or set any reasonable guardrail against arbitrary and discriminatory criminal investigations. The Fourth Amendment safeguards "persons, houses, papers, and effects" against unreasonable searches and seizures. *United States v. Calandra*, 414 U.S. 338, 346 (1974). The lack of guardrails has enabled Arkansas to arbitrarily and discriminatorily investigate Jones Eagle and other companies with suspected ties to ITAR-list countries. Appellants failed to preserve any defense regarding the scope of "reasonable suspicion" and "probable cause" and failed to address the lack of a warrant requirement under the Fourth Amendment. Appellants have asserted no basis for reasonable suspicion or probable cause as to Jones Eagle.

### d. Acts 636 and 174 threaten takings without just compensation.

"The Takings Clause of the Fifth Amendment provides that private property shall not 'be taken for public use, without just compensation.'" *Murr v. Wisconsin*, 582 U.S. 383, 392 (2017) (quoting U.S. Const. amend. V.). Acts 636 and 174 substantially interfere with Jones Eagle's distinct investment backed expectations and threaten forced divestiture of private property with no obligation to make just compensation to the owner. Enforcement threatens substantial and burdensome restrictions on Jones Eagle's pre-existing use of its property, which implicates a fundamental right under Arkansas law. *Blundell*, 258 Ark. at 130. Thus, the Acts violate the Takings Clause, another basis for affirmance.

56

## IX.  CONCLUSION

This Court should affirm the district court's preliminary injunction order.

Respectfully submitted,

Andrew King
Frederick H. Davis
Alexander T. Jones
KUTAK ROCK LLP
124 West Capitol Ave., Suite 2000
Little Rock, AR 72201-3740
Telephone: (501) 975-3000
Facsimile: (501) 975-3001
andrew.king@kutakrock.com
frederick.davis@kutakrock.com
alex.jones@kutakrock.com

Robert S. Chang
Shaleen Shanbhag
FRED T. KOREMATSU CENTER FOR LAW AND
    EQUALITY
UC IRVINE SCHOOL OF LAW
401 E. Peltason Dr.
Irvine, CA 92697
Telephone: (949) 824-3034
rchang@law.uci.edu
sshanbhag@law.uci.edu

Paul L. Hoffman
CIVIL RIGHTS LITIGATION CLINIC
UC IRVINE SCHOOL OF LAW
401 E. Peltason Drive, Suite 1000
Irvine, CA 92697-8000
Telephone: (310) 717-7373
hoffpaul@aol.com

*Counsel for Plaintiff-Appellee*

57

# X.  CERTIFICATE OF COMPLIANCE

Undersigned counsel certifies that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 12,993 words or less. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared with a proportional typeface using Microsoft Word in Times New Roman 14-point font. I further certify that this PDF file was scanned for viruses, and no virus was found on the file. 8th Cir. R. 28A(h)(2).

Dated: August 11, 2025

*/s/ Alexander T. Jones*

Appellate Case: 25-1047     Page: 72     Date Filed: 08/15/2025 Entry ID: 5548363

## XI. CERTIFICATE OF SERVICE

### When All Case Participants are Registered for the
### Appellate CM/ECF System

U.S. Court of Appeals Docket Number: **25-1047**

I hereby certify that on August 11, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Alexander T. Jones*